# UNITED STATES *v.* CALIFORNIA

No. 5, Orig.   Argued March 17, 1980—Decided June 9, 1980

BURGER, C. J., delivered the opinion of the Court, in which all other Members joined, except MARSHALL, J., who took no part in the consideration or decision of the case.

*John Briscoe,* Deputy Attorney General of California, argued the cause for defendant. With him on the briefs were *George Deukmejian,* Attorney General, *N. Gregory Taylor,* Assistant Attorney General, and *Nancy A. Saggese,* Deputy Attorney General.

*Stephen M. Shapiro* argued the cause for the United States. On the brief were *Solicitor General McCree, Assistant Attorney General Moorman, Deputy Solicitor General Claiborne, Allan A. Ryan, Jr., Bruce C. Rashkow,* and *Michael W. Reed.**

---

*\*Avrum M. Gross,* Attorney General, and *G. Thomas Koester,* Assistant Attorney General, filed an *amicus curiae* brief for the State of Alaska.

Mr. Chief Justice Burger delivered the opinion of the Court.

I

The United States began this original action against the State of California under Art. III, § 2, of the Constitution in 1945 to determine whether the right to exploit natural resources under the submerged lands off the California coast belongs to the United States or to California.

In 1947, this Court decreed that the United States owned all submerged lands extending seaward of the ordinary low-water mark on the California coast. *United States* v. *California*, 332 U. S. 804, 805. See also *United States* v. *California*, 332 U. S. 19 (1947). When Congress enacted the Submerged Lands Act of 1953, 67 Stat. 29, 43 U. S. C. § 1301 *et seq.*, the United States, in effect, quitclaimed to California whatever interest the Federal Government may have had in, and to, all lands and natural resources lying within three geographical miles seaward of the California coastline. § 3 (b)(1), 43 U. S. C. § 1311 (b)(1). Congress subsequently enacted the Outer Continental Shelf Lands Act of 1953, 67 Stat. 462, 43 U. S. C. § 1331 *et seq.*, which declared that the United States owned all submerged lands seaward of those granted to California by the Submerged Lands Act. §§ 1332, 1333.

In 1978, the parties filed cross-motions for entry of a supplemental decree. Although those motions proposed three issues for resolution, only one is presently before the Court.[1] That issue is whether the coastline follows the mean lower low-water line along the natural shore, or whether it follows the seaward edge of 15 piers and the Rincon Island complex projecting into the sea from the shore.

_____

[1] The other issues involve the location of the seaward limit of inland waters at the Port of San Pedro and at the mouth of San Diego Bay. The parties acquiesce in the Master's conclusion as to these issues and anticipate their resolution by agreement.

This Court appointed a Special Master who received evidence and submitted recommendations. The Master made the following findings of fact:

Rincon Island is a privately owned artificial "island" off the shore near Punta Gorda, Ventura County, which is used to service offshore oil facilities. It is built upon large concrete tetrapods [2] which rest on the ocean floor, and it has a surface consisting of rock and dirt fill. There are buildings and other structures on the island, all of which are related to an active oil well. On the seaward side of the island is a large dock equipped with hardware for the berthing of vessels.

The island is connected to the mainland by a structure commonly known and identified on maps as the Punta Gorda Causeway. Oil is pumped to shore by a pipeline running beneath and alongside the causeway structure. The wooden causeway deck surface rests on a steel frame supported by pilings filled with gravel and capped with concrete. Water flows freely underneath. Neither the structure nor the island has had any noticeable effect on the shoreline, and the complex is not a coast protective work. [3]

The 15 piers have asphalt, wood, or concrete deck surfaces mounted on precast concrete, steel, or wood pilings. They vary in length from 500 feet (at the Santa Barbara Biltmore Hotel) to 3,500 feet (at Ocean Beach). All are attached to the mainland, and water flows freely underneath each. The piers have no effect on the shoreline; they are not coast protective works. One pier is privately owned by a hotel; 3 others are privately owned and used to supply offshore oil rigs; the remaining 11 are operated by the California State

---

[2] These blocks resemble giant versions of a child's "jacks."

[3] As the Master correctly noted, "Rincon Island could not qualify as an 'island' for purposes of delimiting the territorial sea under the Geneva Convention because it is an artificial island." See Art. 10, Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, [1964] 15 U. S. T. 1606, T. I. A. S. No. 5369: For all intents and purposes, then, the island complex is treated the same as the piers at issue.

Department of Parks and Recreation as docking facilities or for recreational purposes.[4]

The Special Master concluded that neither the Rincon Island complex nor the piers constitute extensions of the coast.[5] The California coastline, he determined, follows the natural coast in the vicinity of these structures for purposes of measuring to the federal-state boundary under the Submerged Lands Act. California filed an exception to the Master's conclusion.

## II

Since passage of the Submerged Lands Act granting California and other States ownership of submerged lands within three miles of their respective coasts, this Court has adverted to the Convention on the Territorial Sea and the Contiguous Zone, Apr. 29, 1958, [1964] 15 U. S. T. 1606, T. I. A. S. No. 5369, for guidance in the definition of the term "coastline." See *Louisiana Boundary Case,* 394 U. S. 11 (1969); *United States* v. *California,* 381 U. S. 139, 165 (1965). The definitional contexts tend to be highly fact bound,[6] and the Convention provides no rule for automatic application. The Submerged Lands Act does not indicate whether the word "coast" was intended by Congress to encompass only the natural shore, or to include structures extending seaward from shore. Although we have recognized in earlier proceedings of this case that some kinds of structures may modify the

---

[4] The piers are not unlike fishing piers found in many coastal areas.

[5] The Master noted that though some shipping is handled at some of the piers, it is insufficient to justify defining them as "ports." For example, one of them is fitted with a coin-operated davit for lowering small boats into the water. We agree with this conclusion. The island, as an island, was disqualified from serving as a base point for measuring the territorial sea because of its artificiality. See n. 3, *supra.*

[6] For other discussions on the significance of factual distinctions and their attendant implications among jetties, groins, breakwaters, and spoil banks, see *Texas* v. *Louisiana,* 426 U. S. 465, 469, and n. 3 (1976); *United States* v. *Louisiana,* 389 U. S. 155, 158 (1967).

California coastline, see the 1977 decree, 432 U. S. 40, this Court has never adopted a view that all structures erected on the coast may be considered extensions of the coast.

Open piers, such as those at issue here, are elevated above the surface of the ocean on pilings. Accordingly, they do not conform to the general rule for establishing a baseline from which to measure the extent of a coastal state's jurisdiction. That rule, contained in Art. 3 of the Convention, states:

> "[T]he normal baseline for measuring the breadth of the territorial sea is the low-water line along the coast as marked on large-scale charts officially recognized by the coastal State."

The type of construction of the piers does not, without more, require a determination adverse to California. See, *e. g.,* *United States* v. *California,* 381 U. S., at 176–177. But the absence of a "lower low-water line" deprives the piers of a "normal baseline," and precludes them from falling within the ambit of Art. 3.

The ultimate conclusion of the Special Master implicitly recognizes this proposition. He did not view the discontinuity of the waterline as dispositive, correctly noting that some breakwaters, for example, also have discontinuous waterlines, and have been held to be part of the coastline. But by considering and disposing of California's claim under Art. 8 of the Convention, in effect on exception to the general rule embodied in Art. 3, see discussion *infra,* he necessarily found the criteria of Art. 3 were not satisfied.

The fact that every National Ocean Survey chart of the California coast "officially recognized" by the United States displays a black line connoting the coastal low-water mark following the configuration of the seaward edge of the 16 structures, as it does groins, breakwaters, and other structures that extend seaward, is likewise not dispositive. We agree with the Master's finding that the charts contain an aggregate of errors and in many places depict the territorial sea without

regard to the coastline. And each chart, as the Master found, includes a disclaimer to that effect.

California suggests that Art. 8 of the Convention also affords support for its position. Article 8 provides:

> "For the purpose of delimiting the territorial sea, the outermost permanent harbour works which form an integral part of the harbour system shall be regarded as forming part of the coast."

Although in an earlier stage of this litigation we incorporated this text into the decree, 382 U. S. 448, 449 (1966), we did not construe the language as encompassing all structures erected on the shore.

The piers and the island complex involved in this case are not a part of outermost harbor works; nor do they form an integral part of a harbor system. We held in the *Louisiana Boundary Case, supra,* that the term "harbour works" refers to " '[s]tructures erected along the seacoast at inlets or rivers for protective purposes, or for enclosing sea areas adjacent to the coast to provide anchorage and shelter.' " 394 U. S., at 37, n. 42.[7] These structures neither "protect," "enclose," nor "shelter";[8] they do not constitute harbor works within the meaning of Art. 8.

A "harbor" under Art. 8 is a body of water providing a haven for safe anchorage and shelter for vessels. See *Louisiana Boundary Case, supra,* at 37, n. 42, citing 1 A. Shalo-

---

[7] In ruling in the *Boundary Case* that Louisiana's dredged channels were not "harbour works," we said:

". . . Article 8 applies only to raised structures. The discussions of the Article by the 1958 Geneva Conference and the International Law Commission reveal that the term 'harbour works' connoted 'structures' and 'installations' which were 'part of the land' *and which in some sense enclosed and sheltered the waters within."* 394 U. S., at 36–37 (emphasis added).

[8] California's coastal engineering expert testified that these piers are designed to have no effect on the movement of the sea. By contrast, groins and jetties are intended to affect wave action.

witz, Shore and Sea Boundaries 60, n. 65 (1962). That the piers and the Rincon Island complex provide no protection has been noted; that they are not bodies of water states the obvious. It follows that since the structures are neither harbor works nor harbors, they cannot constitute an integral part of a harbor system.

The State seeks to import language from the International Law Commission's Commentary to the final draft of Art. 8, primarily Comment 2, Report of the International Law Commission to the General Assembly, U. N. Gen. Ass. Off. Rec., 11th Sess., Supp. No. 9, U. N. Doc. A/3159, p. 16 (1956), as support for its position that Art. 8 should be construed to cover these structures. Comment 2 states:

> "Permanent structures erected on the coast and jutting out to sea (such as jetties and coast protective works) are assimilated to harbour works."

Comment 2 has been held to envision erosion jetties, but we have highlighted the beach protection or harbor protection role they fulfill as well. *Louisiana Boundary Case, supra,* at 49–50, n. 64. A construction of the Comment as including these piers and the island complex which concededly do not fulfill such a role would unwarrantedly extend the most generous intimation of the Comment.[9]

Finally, the State relies upon decisions in which the Longshoremen's and Harbor Workers' Compensation Act, 44 Stat. 1424, 33 U. S. C. § 901 *et seq.,* was applied to accidents which occurred on piers as evidence that Congress intended domestic rather than admiralty law to control judicial construction of

---

[9] Even if we were to assume, as did the Master, that "jetties" means "piers," we would also agree with his conclusion, as we have, that these piers do not fall within Art. 8 because they are not part of a harbor or harbor system. But in light of our disposition it is unnecessary, and we decline, to join the dispute between the parties over the precise definition of "jetties" as contained in the English and French versions of the Convention.

the Submerged Lands Act. *E. g., Nacirema Co.* v. *Johnson,* 396 U. S. 212 (1969); *Travelers Insurance Co.* v. *Shea,* 382 F. 2d 344 (CA5 1967); *Michigan Mutual Liability Co.* v. *Arrien,* 344 F. 2d 640 (CA2 1965); *East* v. *Oosting,* 245 F. Supp. 51 (ED Va. 1965); *Johnson* v. *Traynor,* 243 F. Supp. 184 (Md. 1965). It suggests this is at least an implicit congressional declaration that piers are land, and are thus part of the coast-line. However, in an earlier incarnation of this case, we held to the contrary. *United States* v. *California,* 381 U. S., at 150–154; see also, *Louisiana Boundary Case, supra,* at 19. Nothing that has occurred since that ruling indicates that Congress has withdrawn from the courts the authority to define "coastline." We have looked to the Convention to give content to the Submerged Lands Act; no reason is advanced which persuades us to do otherwise today.

The exception of the State of California to the report of the Special Master is overruled. The Special Master shall prepare a proposed form of decree consistent with this opinion and present it to this Court for entry in due course.

*It is so ordered.*

MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.