**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

ARIIX, LLC,
   *Plaintiff-Appellant*,

v.

NUTRISEARCH CORPORATION; LYLE
MACWILLIAM,
   *Defendants-Appellees.*

No. 19-55343

D.C. No.
3:17-cv-00320-
LAB-BGS

OPINION

Appeal from the United States District Court
for the Southern District of California
Larry A. Burns, Chief District Judge, Presiding

Argued and Submitted April 15, 2020
Pasadena, California

Filed January 22, 2021

Before: Daniel Paul Collins and Kenneth K. Lee, Circuit
Judges, and Gregory A. Presnell,[*] District Judge.

Opinion by Judge Lee;
Dissent by Judge Collins

---

[*] The Honorable Gregory A. Presnell, United States District Judge
for the Middle District of Florida, sitting by designation.

## SUMMARY[**]

### Lanham Act

The panel reversed the district court's dismissal of a false advertising claim under the Lanham Act and remanded for further proceedings.

Addressing whether the First Amendment shields a publisher of supposedly independent product reviews if it has secretly rigged the ratings in favor of one company in exchange for compensation, the panel held that this speech qualifies as commercial speech. Accordingly, a non-favored company may potentially sue the publisher for misrepresentation under the Lanham Act, which prohibits any person from misrepresenting her or another person's goods or services in "commercial advertising or promotion."

Addressing whether the defendant made misrepresentations in advertising or promotion, the panel concluded that the plaintiff plausibly alleged that the defendant's publication was commercial speech, was sufficiently disseminated, and contained actionable statements of fact. The panel left for the district court to decide, on remand, whether defendant's publication was "for the purpose of influencing consumers to buy defendant's goods or services."

Dissenting, Judge Collins wrote that the plaintiff failed to plead sufficient facts to show that it had an actionable

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

claim for false advertising under the Lanham Act. He wrote that, in his view, it was unnecessary to reach the question whether the defendant's publication amounted to commercial speech for First-Amendment purposes because the Lanham Act applies only to a subset of commercial speech, and defendant's publication did not fall within the statute's textual limitations.

## COUNSEL

Aaron R. Gott (argued), Jarod M. Bona, David C. Codell, and Luke Hasskamp, Bona Law PC, La Jolla, California, for Plaintiff-Appellant.

Erik A. Christiansen (argued) and Alan S. Mouritsen, Parsons Behle & Latimer, Salt Lake City, Utah, for Defendants-Appellees.

## OPINION

LEE, Circuit Judge:

This case addresses whether the First Amendment shields a publisher of supposedly independent product reviews if it has secretly rigged the ratings to favor one company in exchange for compensation. We rule that this speech qualifies as commercial speech only, and that a non-favored company may potentially sue the publisher for misrepresentation under the Lanham Act. We reverse the district court's dismissal of the complaint, and remand for further proceedings.

## FACTUAL BACKGROUND

### I. NutriSearch publishes a widely used nutritional supplement guide.

NutriSearch Corporation regularly self-publishes the *NutriSearch Comparative Guide to Nutritional Supplements* (the "Guide"), a book that compares and reviews nutritional supplements sold in the direct marketing industry. Written by Lyle MacWilliam, the Guide has become a trusted name among sales representatives in the direct marketing supplement industry.

The Guide has two types of ratings. First, it comparatively rates supplement products using a five-star rating system based on 18 criteria. Second, companies whose products receive five stars can obtain another certification from NutriSearch. These certifications are called NutriSearch Medals of Achievement. To obtain a medal certification, a company must verify compliance with the FDA's pharmaceutical good manufacturing practices ("GMP") and obtain certification from an approved laboratory that its label claims are true. The complaint alleges that the medal certifications are "described as a binary determination: either a company obtains [GMP] certification and laboratory verification of the label claims, or it does not." In the sixth edition of the Guide, Usana Health Science, Inc. was the only company that obtained the highest ranking, the platinum medal.

NutriSearch portrays itself as an independent company that presents only objective data and scientific analyses to the public. For example, NutriSearch claims on its website that it relies on scientific criteria to mathematically calculate the ratings. Further, MacWilliam, the author of the Guide and the former CEO of NutriSearch, has appeared on the

Dr. Oz Show promoting the Guide as an evidence-based book that does not have any "particular bias." Most relevant to this appeal, the inside of every edition of the Guide through the fifth edition had the following disclaimer:

> This guide is intended to assist in sorting through the maze of nutritional supplements available in the marketplace today. It is not a product endorsement and does not make any health claim. It simply documents recent findings in the scientific literature.
>
> This guide was not commissioned by any public sector or private sector interest, or by any company whose products may be represented herein. The research, development, and findings are the sole creative effort of *the author and NutriSearch Corporation, neither of whom is associated with any manufacturer or product represented in this guide.* (emphasis added).

NutriSearch removed the second paragraph from the sixth edition of the Guide, which was published months after Ariix filed this lawsuit.

## II. Ariix alleges that NutriSearch rigged its ratings to favor Usana under a hidden financial arrangement.

NutriSearch's claims of neutrality are false, according to Ariix, LLC, a nutritional supplement company that competes fiercely with Usana.[1] Despite assertions of being a neutral

---

[1] Because the complaint was dismissed at the pleading stage, we assume for purposes of this appeal that the allegations in the complaint

third-party reviewer, NutriSearch allegedly has a secret — and mutually lucrative — relationship with Usana.

MacWilliam — who worked as a Usana sales representative and served on its scientific advisory board — at first conceived the Guide to boost sales of Usana products, according to Ariix. MacWilliam remained a Usana sales representative and advisory board member until another company exposed this affiliation. When this happened, MacWilliam allegedly told former Usana executives, "I should not be on the board or a representative anymore because it looks like I'm biased. I am going to create more of a third-party appearance, but I'd like you to use me for speaking and support me." Usana agreed to this arrangement in exchange for the number one rating in the Guide. Usana also encourages its sales representatives to buy the Guide and to refer to it in marketing pitches to customers.

Now, Usana annually pays hundreds of thousands of dollars in speaking and promotion fees to NutriSearch and MacWilliam in exchange for being rated the top supplement company in the Guide. Usana's payments to MacWilliam allegedly account for more than 90% of his income.

The complaint alleges additional examples of NutriSearch and MacWilliam colluding with Usana to tweak the Guide's ratings criteria to benefit Usana. NutriSearch promotes certain scientific claims to dovetail with Usana's marketing campaign, or emphasizes certain ingredients that Usana has added to its products to ensure that Usana attains the top ranking in the Guide.

---

are true. Whether Ariix can prove these allegations, of course, is a different question and is left for another day.

In 2008, Usana withdrew its support for NutriSearch after other companies obtained a medal certification in the Guide. That caused NutriSearch's sales and MacWilliam's speaking engagements to drop. A Usana executive suggested that Usana would recommence providing fees and speaking engagements if Usana obtained a number one ranking in some way. NutriSearch then released a new "Editor's Choice" award and gave it to Usana. Afterwards, MacWilliam approached Usana and, according to a former Usana executive, stated that "I would like to do a tour for Usana" and that "Usana is number one Editor's Choice, and I'll travel from city to city so my wife and I can go on a summer-long vacation and basically I want you to pay for it." Usana paid MacWilliam $90,000 for that tour.

## III.    NutriSearch improperly thwarts Ariix from obtaining the top rating.

Ariix considers itself Usana's fiercest competitor in both sales and recruitment of independent sales representatives. Because of this rivalry, Ariix asserts that NutriSearch has improperly thwarted Ariix from obtaining the top medal certification in the Guide.

Ariix first applied for a medal certification in 2014. The application was denied because NutriSearch decided to stop accepting reports and certifications from ISO-17025-certified laboratories.[2] Even though prior medal recipients used ISO-17205-certified labs, NutriSearch applied this new

---

[2] There was apparently an NBC Dateline expose on something called "dry-labbing" that caused NutriSearch to re-think its application guidelines. The parties do not explain what dry-labbing is, and it is of minimal significance to this appeal.

restriction only on a future basis, exempting the previous recipients (including Usana) from the new requirement.

In response, Ariix sought to obtain a new analysis of its formulation by using new protocols and procedures that followed NutriSearch's new guidelines. When Ariix submitted its new results, NutriSearch stated that "we can insert your NutriSearch GOLD Medal of Achievement into future printings of the existing guide once current stock has been depleted." NutriSearch released a new edition of the Guide, the sixth edition, but it did not include Ariix's medal certification. NutriSearch then stopped responding to Ariix's inquiries.

Ariix also alleges that Usana in 2011 misappropriated Ariix's confidential information and draft marketing materials about its debut product and gave them to NutriSearch with the instruction "to run a new printing for the express purpose of thwarting Ariix's entry to the market." At first, NutriSearch rated this product 3.5 stars, but after public criticism and incontrovertible evidence of quality, NutriSearch revised the rating to 5 stars.

Finally, Ariix points to its failed attempts to engage MacWilliam as a speaker. Ariix offered MacWilliam an opportunity to speak at one of Ariix's conventions, but in September 2014, MacWilliam declined, explaining he was not taking any more speaking engagements. MacWilliam, however, continued to take speaking engagements with Usana. When confronted with this apparent favoritism, MacWilliam admitted that "[t]hey [Usana] will cut me off the second I do this [speak for Ariix]."

## PROCEDURAL HISTORY

Ariix filed a complaint in district court against NutriSearch and MacWilliam, alleging a false advertising claim under Section 43(a) of the Lanham Act. *See* 15 U.S.C. § 1125(a)(1)(B). In response, the defendants moved to dismiss for failure to state a claim.

The district court granted the defendants' motion to dismiss the complaint. The district court interpreted the complaint as based on two sets of alleged misrepresentations: (1) NutriSearch misrepresented Ariix and its products as not being top quality and not worthy of a medal certification, and (2) NutriSearch misrepresented itself as objective and neutral, when it is in fact a "shill" for Usana. In deciding the motion, the court held that the Lanham Act does not apply to consumer product reviews, even if they are biased, inaccurate, or tainted by favoritism. It then reviewed the definition of "commercial advertising or promotion" in § 1125(a)(1)(B) and found that the Guide did not meet this definition because it was not commercial speech and because its statements of neutrality were not sufficiently disseminated. It also found that the statements in the Guide were unactionable statements of opinion rather than actionable statements of fact.

Ariix filed an amended complaint. The amended complaint had more allegations about the relationship among NutriSearch, MacWilliam, and Usana as well as more details on the type of statements used to market the Guide. Again, the defendants moved to dismiss for failure to state a claim.

The district court granted the motion and dismissed the action with prejudice. The court noted that it incorporated much of the earlier order and affirmed its conclusion that the

Guide as a whole and any statements in the Guide are not commercial advertising within the scope of the Lanham Act. It also rejected the argument that the relationship between the defendants and Usana made it plausible that the Guide was commercial advertising. The court found that none of the asserted statements, including statements about the ratings' methodology and the failure to award the medal certification, were actionable.

Ariix then timely filed its notice of appeal to this court.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 15 U.S.C. § 1121(a) and 28 U.S.C. § 1291. "We review *de novo* the district court's dismissal for failure to state a claim." *Wilson v. Lynch*, 835 F.3d 1083, 1090 (9th Cir. 2016). "When ruling on a motion to dismiss, we accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Knievel v. ESPN*, 393 F.3d 1068, 1072 (9th Cir. 2005). Our task is to "determine whether [the well-pleaded factual allegations] plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). *See also Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011) ("[T]he factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation.").

## DISCUSSION

The district court made two main determinations about Ariix's false advertising claim:   The Guide is not

commercial advertisement under the Lanham Act and it lacks statements that are actionable.[3]

## I. Ariix has plausibly alleged that NutriSearch engaged in commercial speech, but we remand for the district court to consider the "purpose of influencing" element under the Lanham Act.

The Lanham Act prohibits any person from misrepresenting her or another person's goods or services in "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). The Act does not define "advertising" or "promotion," but this court has adopted the following definition: (1) commercial speech, (2) by a defendant who is in commercial competition with plaintiff, (3) for the purpose of influencing consumers to buy defendant's goods or services, and (4) that is sufficiently disseminated to the relevant purchasing public. *See Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999).

The parties focus mainly on the first element: whether NutriSearch's Guide qualifies as "commercial speech." If it is not commercial speech, then the Lanham Act claim must fail, as the Guide would receive robust protection under the First Amendment. But if the Guide is commercial speech, our First Amendment jurisprudence allows more restrictions, including permitting a potential cause of action under the Lanham Act. *See Central Hudson*, 447 U.S.

---

[3] There are five elements to a false advertising claim under § 1125(a), but the district court's two determinations address only one element (*i.e.*, whether there was "a false statement of fact by the defendant in a commercial advertisement about its own or another's product"). *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071–72 (9th Cir. 2014). We thus limit our analysis to this element.

at 562–63 (explaining that commercial speech receives lesser protection than other types of speech). We address each of the four elements below.

A. *Whether the Guide constitutes commercial speech.*

We first address whether Ariix's complaint plausibly alleges that the Guide is commercial speech. *See Coastal Abstract*, 173 F.3d at 735. We disagree with the district court's conclusion that the Guide is not commercial speech because the complaint plausibly alleges that the Guide is essentially a sham marketing ploy intended to boost Usana products.

Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). Courts view "this definition [as] just a starting point," however, and instead try to give effect to "a 'common-sense distinction' between commercial speech and other varieties of speech." *Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 516 (7th Cir. 2014) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 455–56 (1978)). Indeed, "[o]ur commercial speech analysis is fact-driven, due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1272 (9th Cir. 2017) (internal quotation marks omitted).

On its face, the Guide purportedly describes the science of nutritional supplements and provides ratings for various nutritional supplement products.[4] Based on this general

---

[4] Although the Guide is central to both parties' arguments, neither party has attached the Guide as part of the record on appeal or filed the

description alone, the Guide does not appear to propose a commercial transaction.  But speech that does not propose a commercial transaction on its face can still be commercial speech.  *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66–68 (1983) (finding that informational pamphlets that "cannot be characterized merely as proposals to engage in commercial transactions" were still commercial speech).

Because of the difficulty of drawing clear lines between commercial and non-commercial speech, the Supreme Court in *Bolger* outlined three factors to consider.  "Where the facts present a close question, 'strong support' that the speech should be characterized as commercial speech is found where [1] the speech is an advertisement, [2] the speech refers to a particular product, and [3] the speaker has an economic motivation."  *Hunt v. City of L.A.*, 638 F.3d 703, 715 (9th Cir. 2011) (citing *Bolger*, 563 U.S. at 66–67).  These so-called *Bolger* factors are important guideposts, but they are not dispositive.  *See Bolger*, 463 U.S. at 67 n.14 ("Nor do we mean to suggest that each of the characteristics present in this case must necessarily be present in order for speech to be commercial."); *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 958 (9th Cir. 2012).

Applying those *Bolger* factors, we face a close question.

First, neither side materially disputes that the Guide is not in the traditional form of an advertisement — for example, there is no price or availability information listed.  But this fact alone does not tell us much, especially given today's sophisticated and subtle marketing campaigns.  For

Guide as an exhibit in the district court.  This was a curious decision.  Thus, our decision is limited to the descriptions of the Guide as alleged in the complaint.

example, companies now pay so-called "influencers" to issue posts on social media touting their products or services.[5]  While such social media posts may not have the indicia of a traditional advertisement, there can be little doubt that these paid posts are in fact advertisements. *See* Federal Trade Commission, *FTC Staff Reminds Influencers and Brands to Clearly Disclose Relationship* (Apr. 19, 2017), https://www.ftc.gov/news-events/press-releases/2017/04/ftc-staff-reminds-influencers-brands-clearly-disclose ("After reviewing numerous Instagram posts by celebrities, athletes, and other influencers, Federal Trade Commission staff recently sent out more than 90 letters reminding influencers and marketers that influencers should clearly and conspicuously disclose their relationships to brands when promoting or endorsing products through social media.").

Second, neither side materially disputes that the Guide refers to specific products.[6]  But this element does not shed much light, either.  A publication that is not in a traditional advertising format but that still refers to a specific product can either be commercial speech — or fully protected speech. *Compare United States v. Wenger*, 427 F.3d 840, 847–48 (10th Cir. 2005) (finding that a newsletter

---

[5] A prominent influencer, Kim Kardashian West, stated in a declaration that she receives $300,000 to $500,000 for a single Instagram post endorsing a company's product.  *See* Declarations of Kim Kardashian West, Todd Wilson, and Gregory Korn Filed in support of Plaintiffs' Motion for Entry of Default and Default Judgment at 4, *Kimsaprincess, Inc. v. Misguided USA (Finance) Inc.*, No. 19-cv-01258 (C.D. Cal. May 3, 2019), Dkt. No. 19-1.

[6] NutriSearch argues in its answering brief that "the *Guide* does not refer to 'a specific product,'" but the very next sentence concedes that "[t]o be sure, it refers to more than 1,000 nutritional supplements."

concerning investment advice is commercial speech even though it "is concededly not a traditionally structured advertisement") *with Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 686 (7th Cir. 1998) (citing cases that show that product reviews are generally not commercial speech).

The third *Bolger* factor — whether the speaker had an economic motivation — requires a more thorough explanation. This factor asks whether the speaker acted *primarily* out of economic motivation, not simply whether the speaker had *any* economic motivation. *See Procter & Gamble Co. v. Amway*, 242 F.3d 539, 552–53 (5th Cir. 2001), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118 (2014) ("The question whether an economic motive existed is more than a question whether there was an economic incentive for the speaker to make the speech; the *Bolger* test also requires that the speaker acted *substantially* out of economic motivation." (footnote omitted)); *Am. Future Sys., Inc. v. Pennsylvania State Univ.*, 752 F.2d 854, 862 n.26 (3d Cir. 1984) ("The critical question would be whether the primary purpose of the organization was to sponsor religious activity or to sell Bibles, and the *Bolger* criteria would be applied in an attempt to answer this question.").

Indeed, not all types of economic motivation support commercial speech. A simple profit motive to sell copies of a publication or to obtain an incidental economic benefit, without more, does not make something commercial speech. Otherwise, virtually any newspaper, magazine, or book for sale could be considered a commercial publication. *See*, *e.g.*, *Bolger*, 463 U.S. at 67 ("Finally, the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into

commercial speech."); *Dex Media*, 696 F.3d at 960 (finding that the financial benefit obtained from publishing yellow pages directories could not characterize the publication as commercial); *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521, 1541 (S.D.N.Y. 1994) ("The fact that AIP and APS stood to benefit from publishing Barschall's results—even that they *intended* to benefit—is insufficient by itself to turn the articles into commercial speech.").

At the same time, however, economic motivation is not limited simply to the expectation of a direct commercial transaction with consumers. Courts have found commercial speech even when it involves indirect benefits, such as benefits to employee compensation (*First Resort*, 860 F.3d at 1273), improvements to a brand's image (*Jordan*, 743 F.3d at 519–20), general exposure of a product (*Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008)), and protection of licensees' interests (*Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 193 F. Supp. 3d 556, 568–69 (E.D. Va. 2016)). Importantly, the type of economic motivation is not the focus; rather, the crux is on whether the speaker had an adequate economic motivation so that the economic benefit was the primary purpose for speaking.[7]

---

[7] We do not intend to collapse the *Bolger* factors into this one factor; no one factor will be dispositive. As the Fifth Circuit pointed out, speech that is mainly motivated out of economic benefit can still be fully protected, such as in labor cases. *See Procter*, 242 F.3d at 553 & n.30. Nor do we suggest that any economic benefit satisfies this factor. Rather, the question is context-specific and requires determining whether the speaker's purpose primarily turns on the economic benefit that the speaker receives from the speech.

With the above in mind, we find that Ariix has plausibly alleged that NutriSearch and MacWilliam published the Guide mainly with the economic goal of furthering their own self-interests beyond simply benefiting from sales of the publication. Specifically, Ariix has alleged enough to make it plausible that NutriSearch and MacWilliam published the Guide mainly to reap the financial benefits of a hidden marketing arrangement with Usana rather than to inform consumers about nutritional supplements. For example:

- To begin with, MacWilliam, who worked for Usana, concocted the Guide to ratchet up sales for Usana products, according to the complaint.

- Ariix alleges a specific conversation in which Usana agreed to pay MacWilliam's speaking fees if NutriSearch gave Usana the "number one rating." Since then, MacWilliam and NutriSearch allegedly receive hundreds of thousands of dollars annually in speaking and other fees from Usana.

- Ariix also alleges an incident in which Usana threatened to pull its support for NutriSearch when other companies obtained a medal certification making them appear equal to Usana. In response, NutriSearch created a new "Editor's Choice" award to give to Usana, the only company to receive this award. MacWilliam then used this award as a reason to persuade Usana to pay him for

a "summer-long vacation" in which he promoted Usana.

We do not, however, rely only on the allegations of payments. Many of Ariix's allegations raise significant doubts about whether the Guide is an objective compilation of product reviews and suggest that the Guide is instead a sham marketing scheme intended to benefit Usana.

First, the disclaimer included in the first five editions of the Guide stated that the book is "the sole creative effort of the author and NutriSearch Corporation, neither of whom is associated with any manufacturer or product represented in this guide." That disclosure statement is false, at least according to the allegations in the complaint. Indeed, the Guide's genesis was as a marketing tool to sell Usana products.[8] Today, Usana even uses MacWilliam as part of its image advertising; the complaint includes an image of MacWilliam that states that "I have full confidence that USANA will once again stand out as an industry leader and will continue to receive an elite standing in the new Comparative Guide." That NutriSearch and MacWilliam chose such a strongly worded yet false disclaimer — disclaiming *any* association with *all* manufacturers in the Guide despite having obvious ties to Usana — raises

---

[8] The district court noted that the factual allegations do not show that the defendants should be treated as a single entity subject to the same conflicts of interest. But showing that the defendants are so closely related as to constitute a single entity is not required to plausibly allege that the Guide was published primarily for economic benefit. We are not asking whether MacWilliam's actions influence NutriSearch or vice versa, but whether allegations involving either defendant reveal the primary purpose of the Guide.

substantial questions about the Guide's true purpose, if the allegations in the complaint are true.

Ariix also alleges collusion about how the Guide's criteria are chosen. MacWilliam and NutriSearch allegedly re-wrote the fifth edition of the Guide to promote vitamin D and iodine content because it would coincide with Usana's new product formulations and marketing claims. In addition, the defendants allegedly coordinated with Usana to have the sixth edition focus on "cell-signaling" to match Usana's new marketing campaign focused on cell-signaling. Finally, the complaint alleges that the defendants reworked the Guide's medal certifications to award Usana the highest medal certification (the Platinum Medal of Achievement), something no other company earned.

To be clear, our decision today is a narrow one that is tied specifically to the troubling allegations in this case: they plausibly suggest that the Guide is more like a sophisticated marketing sham rather than a product review guide. Today, consumers face waves of advertisements amid a sea of product choices. To navigate the seemingly unending stream of advertisements, consumers often depend on independent reviews for candid and accurate assessments. But when someone falsely claims to be independent, rigs the ratings in exchange for compensation, and then profits from that perceived objectivity, that speaker has drowned the public trust for economic gain. Society has little interest in protecting such conduct under the mantle of the First Amendment. *Cf. Central Hudson*, 447 U.S. at 563 ("[T]here can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity."). Such speech becomes more like "the offspring of economic self-interest" that "is a hardy

breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'" *Id.* at 564 n.6.

We are guided by a common-sense distinction between protected speech and commercial speech — in this case, legitimate product reviews versus paid product promotion — in determining whether the Guide is commercial speech. *Cf. Wenger*, 427 F.3d at 848 ("While *disinterested* investment advice will still qualify for full First Amendment protection, paid publicists' speech is grounded in commercial transactions of the kind that the state has traditionally regulated."). Simply put, paid promotion is commercial speech.

Though NutriSearch urges us to rule that biased and inaccurate reviews are fully protected speech, Ariix does not allege that the Guide is simply biased or inaccurate. A mere failure to disclose bias or financial interest would not necessarily make speech commercial. Here, though, we face allegations that the defendants conceived the Guide to juice sales of Usana products, actively misled the public about their supposed independence, and fiddled with their own ratings criteria to boost a favored company that lavishes them with hundreds of thousands of dollars in compensation. Put another way, it is more paid promotion than product review, according to the complaint. It is not controversial to conclude that "liability can arise under the Lanham Act if websites purporting to offer reviews are in reality stealth operations intended to disparage a competitor's product while posing as a neutral third party." *GOLO, LLC v. HighYa, LLC*, 310 F. Supp. 3d 499, 505 (E.D. Pa. 2018). In short, taking the allegations in Ariix's complaint as true at the pleading stage, we hold that Ariix plausibly alleged that the Guide amounts to commercial speech.

But that does not end our inquiry. Commercial speech can lose its commercial character when it is "inextricably intertwined" with fully protected speech. *Dex Media*, 696 F.3d at 958. If "[n]o law of man or of nature makes it impossible" to present the noncommercial aspects of the speech without the commercial aspects, then the noncommercial speech is not inextricably intertwined with the commercial speech. *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 474–75 (1989) (finding that the home economics elements of Tupperware sales presentations were not inextricably intertwined with the sales pitches done in campus dormitories).

The Guide does include what appears to be fully protected speech: It has an "informational" part that describes the benefits and science of nutritional supplements. But the commercial parts of the Guide — specifically, the allegedly rigged ratings of nutritional supplements — are not so connected to this informational section to lose their commercial character. On the contrary, they seem easily separable. The Guide is described as consisting of two individual sections: an informational section and a ratings section. Nothing prevents NutriSearch from publishing the informational section as a separate publication from its ratings. Indeed, the Guide does not gain full First Amendment protection simply because it includes a distinct summary of scientific ideas as a prelude to its supposed product reviews. *See Central Hudson*, 447 U.S. at 562 n.5 (rejecting the notion that speech that merely "links a product to a current public debate" gains broad constitutional protection given that "many, if not most, products may be tied to public concerns with the

environment, energy, economic policy, or individual health and safety").[9]

### B. *Whether NutriSearch is in commercial competition with Ariix.*

The next element is whether the defendant is in commercial competition with the plaintiff. *Coastal Abstract*, 173 F.3d at 735. The district court, though noting that this element "is likely in need of revision," did not reach

---

[9] On a related note, the defendants argue that we must construe the Lanham Act to not apply to the Guide because otherwise this would violate their First Amendment rights to speak on matters of public concern. But as noted, false advertising claims under the Lanham Act apply only to commercial speech. *Coastal Abstract*, 173 F.3d at 735. And the "Constitution [] accords a lesser protection to commercial speech than to other constitutionally guaranteed expression," and "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity." *Central Hudson*, 447 U.S. at 562–63. *See also Bolger*, 463 U.S. at 68 ("A company has the full panoply of protections available to its direct comments on public issues, so there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions."). Because we hold that Ariix plausibly alleged that the Guide is commercial speech, there are no First Amendment concerns in applying § 1125(a)(1)(B) to the Guide. The cases cited by NutriSearch do not apply. *See United States v. Alvarez*, 617 F.3d 1198, 1206 n.6 (9th Cir. 2010) ("Here, there is no suggestion that the Act targets commercial speech, and therefore we do not address commercial speech given the unique way in which it is treated under the First Amendment." (footnote omitted)); *Nike, Inc. v. Kasky*, 539 U.S. 654, 679 (2003) (Breyer, J., dissenting from dismissal of writ as improvidently granted) (addressing "a private 'false advertising' action brought on behalf of the State, by one who has suffered no injury" and noting that the "delegation of state authority to private individuals authorizes a purely ideological plaintiff, convinced that his opponent is not telling the truth, to bring into the courtroom the kind of political battle better waged in other forums").

this question, and the parties agreed that *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) likely abrogated this element. NutriSearch has waived any argument on this ground, given that it "agree[d] that a plaintiff is no longer required to show that a misrepresentation was made by a commercial competitor to sue under § 1125(a)(1)(B)." We therefore assume without deciding that Ariix need not satisfy this element.

C. *Whether the Guide was intended to influence consumers to buy the defendants' goods.*

The third element is whether the advertisement or publication was issued "for the purpose of influencing consumers to buy *defendant's* goods or services." *Coastal Abstract*, 173 F.3d at 735 (emphasis added).

Here, though, the alleged advertising (the Guide) is intended to help *Usana's* goods, not NutriSearch's product. The district court did not rule on this issue, and the parties have not briefed this issue before this court. We thus remand for the district court to consider this question in the first instance.[10]

---

[10] The dissent's analysis of this statutory requirement is well taken. But because the parties have not briefed this issue and the district court did not rule on it, we remand it for further consideration. In considering this question, though, it may be useful to determine whether the defendants and Usana had an agency relationship; for example, it might be the case that the defendants were acting as agents of Usana and therefore had a vested interest in the goods that Usana sold, which might be enough to satisfy this element.

D.  *Whether the Guide was sufficiently disseminated.*

The last element is whether the publication was sufficiently disseminated to the relevant purchasing public. *Coastal Abstract*, 173 F.3d at 735.  To be "sufficiently disseminated," the actions must be "part of an organized campaign to penetrate the relevant market," which typically involves "widespread dissemination within the relevant industry."  *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,* 314 F.3d 48, 57 (2d Cir. 2002).  *See also Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1054 (9th Cir. 2008) (concluding that allegedly false statements were sufficiently disseminated because they were made in promotional literature distributed to thousands of sales accounts).

The Guide plausibly fits this standard, given that Ariix alleges that the "professional edition [of the Guide] is specifically designed for and marketed to tens of thousands of Usana sales representatives, who are told that referring prospective customers to the guide is one of the most effective ways to sell Usana products."[11]

---

[11] The district court mistakenly analyzed whether statements within the Guide were sufficiently disseminated as an independent issue from whether the Guide as a whole was sufficiently disseminated.  Because the district court concluded that the Guide as a whole was not commercial speech, however, that should have ended the inquiry.  *See Dex Media*, 696 F.3d at 957–58.  If the Guide as a whole is not commercial speech, then statements within the Guide could not have been commercial advertising.

## II. Ariix has plausibly alleged that the Guide contains misrepresentations.

For NutriSearch and MacWilliam to be liable for false advertising under the Lanham Act, the Guide must include false or misleading representations of fact, not simply statements of opinion. *See Coastal Abstract*, 173 F.3d at 730. An actionable statement is "a specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Id.* at 731. *See also Newcal Indus.*, 513 F.3d at 1053 ("Thus, a statement that is quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product,' may be an actionable statement of fact."). We have explained that "a false advertising claim may be based on implied statements" as long as those statements are specific and deceptive. *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020). Statements of opinion and puffery, however, are not actionable. *See Newcal*, 513 F.3d at 1053.

The comparative five-star ratings in the Guide are not actionable. They are simply statements of opinion about the relative quality of various nutritional supplement products. Ariix insists that these "star" ratings are factual because the Guide purports to rely on scientific and objective criteria. But there is an inherently subjective element in deciding which scientific and objective criteria to consider. For example, publications that rank colleges or law schools purportedly rely on objective criteria (*e.g.*, acceptance rates, test scores, class size, endowment), but selecting those criteria involves subjective decision-making. Ariix also points to statements made by MacWilliam asserting that he "didn't want to put our particular bias into it" or that the Guide relies on a "higher standard of evidence." But such unquantifiable assertions are "classic, non-actionable

opinions or puffery." *Prager Univ.*, 951 F.3d at 1000 (finding that lofty but vague statements that appeal to free speech and open dialogue are not actionable).

Ariix is on more fertile ground when it refers to the disclaimer of independence found in the fifth edition of the Guide. The claim that NutriSearch and MacWilliam are not associated with any manufacturer listed in the Guide is a statement of fact that can be proven true or false.

In addition, the failure to award Ariix a medal certification presents specific and measurable statements about Ariix. Ariix describes the medal certification as "a binary determination" based on two falsifiable criteria: compliance with the FDA's pharmaceutical good manufacturing practices and certification of product labels' claims from an approved laboratory. By not awarding Ariix a medal certification — despite Ariix being eligible for such an award — the Guide falsely implies to consumers that Ariix did not comply with the FDA's GMPs or that it did not obtain the appropriate laboratory certification.[12] This is false, at least based on the allegations in the complaint. Apparently, NutriSearch itself admitted that Ariix achieved certification pending final laboratory reports and even offered to "insert your NutriSearch GOLD Medal of Achievement into future printings of the existing guide." Indeed, the complaint alleges that Ariix was the only qualified applicant to have followed NutriSearch's new application guidelines, yet it still did not receive the

---

[12] The district court rejected the notion that compliance with the FDA's GMPs can be a statement of fact because consumers would merely "conclude that perhaps a manufacturer did not follow practices that the FDA considered good." Whether Ariix followed those practices, however, is a question of fact.

certification. These implications are specific, measurable, and capable of being falsified, so they are actionable statements for a false advertising claim under § 1125(a)(1)(B).

## CONCLUSION

We find that Ariix's allegations are enough to overcome the defendants' challenges. Ariix plausibly alleges that the Guide is commercial speech, is sufficiently disseminated, and contains actionable statements of fact. We make no decision, however, about whether Ariix meets the Lanham Act's third element of the definition of "commercial advertising or promotion" — *i.e.*, whether the Guide was "for the purpose of influencing consumers to buy defendant's goods or services" — and leave this issue for the district court to decide in the first instance. We reverse and remand to the district court for further proceedings consistent with this opinion.

## REVERSED AND REMANDED.

COLLINS, Circuit Judge, dissenting:

In my view, Plaintiff-Appellant Ariix, LLC, a manufacturer of nutritional supplements, has failed to plead sufficient facts to show that it has an actionable claim for false advertising under § 43(a)(1)(B) of the Lanham Act against Defendants-Appellees NutriSearch Corporation and Lyle MacWilliam ("Defendants"). Defendants are respectively the publisher and author of the *NutriSearch Comparative Guide to Nutritional Supplements* ("*Guide*"), a guidebook that evaluates and rates hundreds of nutritional supplements, and Ariix complains that the *Guide*'s reviews

are really covert advertisements for Usana Health Sciences, Inc. ("Usana"), Ariix's primary competitor. In reversing the district court's dismissal of Ariix's novel complaint, the majority rests on the dubious premise that the *Guide* constitutes "commercial speech," and it remands for consideration of additional issues. Because I think it is already clear that Ariix cannot state a claim under the Lanham Act, I respectfully dissent.

# I

The operative complaint in this case asserts a single cause of action for false advertising in violation of § 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B). That section imposes civil liability on:

> [a]ny person who, on or in connection with any goods or services, . . . uses in commerce . . . any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . *in commercial advertising or promotion*, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

*Id*. (emphasis added). To succeed on such a claim, Ariix thus must plead and prove, *inter alia*, that Defendants made the challenged false or misleading representations "in commercial advertising or promotion." *Id*. The theory of Ariix's complaint is that, due to MacWilliam's and NutriSearch's financial relationships with Usana, the *Guide*, or at least portions of it, should be deemed to be "commercial advertising or promotion" of Usana's products within the meaning of § 43(a)(1)(B). Ariix alleges that the challenged statements in the *Guide* were false and misleading because

Defendants' ties to Usana were concealed and because the *Guide* falsely stated or implied that its evaluations were independent, neutral, and objective when in fact they were biased and rigged.[1]

The majority concludes that, under *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983), "Ariix plausibly alleged that the Guide amounts to commercial speech" for First-Amendment purposes, and it reverses the district court's contrary conclusion and remands for further proceedings. *See* Maj. Opin. at 14–16, 21–22, 27. In my view, it is unnecessary to reach this broader (and troubling) constitutional question, because the Lanham Act applies

---

[1] Some aspects of the complaint appear to rely on the alternative theory that Defendants have falsely advertised the *Guide* itself, rather than Usana's products, but such a theory adds nothing here. The only false statements the complaint alleges that Defendants made in advertising the *Guide* were ones repeating the *Guide*'s claim that its ratings and methods were objective and unbiased. But we have stated that "advertisements that accurately reprinted false claims contained in the advertised works were protected from tort liability to the same degree as the underlying works." *Charles v. City of Los Angeles*, 697 F.3d 1146, 1154 (9th Cir. 2012). This theory is thus *not* independent of, or alternative to, Ariix's theory that the *Guide* itself contains only lesser-protected commercial speech. Moreover, the complaint fails to plead sufficient facts to raise a plausible inference that any injury to Ariix is proximately caused by the advertising of the *Guide*, as opposed to the product reviews contained *in* the *Guide*. *See Lexmark*, 572 U.S. at 132–34 (proximate causation is an essential element of a claim under § 43(a)(1)(B)). Ariix does not, for example, assert that it sells a competing guide whose sales suffered by alleged false advertising for Defendants' *Guide*. The viability of Ariix's complaint consequently turns entirely on whether the *Guide* itself, or portions of it, constitute "commercial advertising or promotion" *of Usana's products* within the meaning of the Lanham Act.

only to a *subset* of commercial speech, and the *Guide* does not fall within the statute's textual limitations.

## A

As the wording of the Act confirms, the "commercial advertising or promotion" covered by § 43(a)(1)(B) does not "'encompass all commercial speech.'" *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020) (quoting *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 57 (2d Cir. 2002)). Rather, relying upon the test articulated in *Gordon & Breach Science Publishers S.A. v. American Institute of Physics*, 859 F. Supp. 1521 (S.D.N.Y. 1994), we have held that "commercial advertising or promotion" embraces only that subset of "commercial speech" that is (1) made "'by a defendant who is in commercial competition with plaintiff'"; (2) "'for the purpose of influencing consumers to buy defendant's goods or services'"; and (3) "'disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry.'" *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 735 (9th Cir. 1999) (quoting *Gordon & Breach*, 859 F. Supp. at 1536). I address each of these three statutory limitations in turn.

As the majority notes, *see* Maj. Opin. at 22–23, Defendants expressly concede—correctly, in my view—that the first of these three limitations did not survive the Supreme Court's decision in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). Although it is true that *Lexmark* specifically declined to decide whether the communications at issue in that case constituted "commercial advertising or promotion," *id.* at 123 n.1, the Court unanimously and explicitly rejected lower-court rulings—including from this court—that had limited standing to sue for false advertising under § 43(a)

only to competitors of the defendant, *id*. at 136. The Court rejected that limitation because it could not be found in the text of the Lanham Act, nor could it be deduced from the limitations that are in that text. *Id*. at 136–39. Given that (1) a competitors-only limitation similarly lacks any textual grounding in the phrase "commercial advertising or promotion," *see Grubbs v. Sheakley Grp., Inc.*, 807 F.3d 785, 801 (6th Cir. 2015); *Fashion Boutique*, 314 F.3d at 58; (2) *Gordon & Breach* derived this atextual limitation from its review of pre-*Lexmark* caselaw, *see* 859 F. Supp. at 1532–33; and (3) *Lexmark*'s emphatic rejection of a competitors-only limitation would be wholly undone by continued adherence to this aspect of *Gordon & Breach*, the conclusion is inescapable that *Lexmark* precludes limiting "commercial advertising or promotion" only to the commercial advertising and promotion of a direct competitor. *See Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.*, 700 F. App'x 251, 257 (4th Cir. 2017) ("Taking into account *Lexmark*, the lack of a competition requirement in the statute's false advertising prohibition, the fact that our sister circuits adopting the competition factor did so before *Lexmark*, and that the only circuit to examine the *Gordon & Breach* factors post-*Lexmark* has rejected the competition factor, we also do not require a competitive relationship when determining whether a communication is advertising or promotion."); *but see Straus v. Angie's List, Inc.*, 951 F.3d 1263, 1268–69 & n.5 (10th Cir. 2020).

Nothing in *Lexmark*, however, undermines *Gordon & Breach*'s sufficient-dissemination requirement, which properly recognizes that "commercial advertising" typically refers to speech that is *generally distributed* to persons in the relevant market. *See Advertising*, Black's Law Dictionary (11th ed. 2019) ("The action of drawing *the public's*

*attention* to something to promote its sale." (emphasis added)). I agree with the majority that, as to the *Guide*, this requirement was adequately pleaded in Ariix's complaint. *See* Maj. Opin. at 24.

That leaves only *Gordon & Breach*'s requirement that the commercial advertising be "for the purpose of influencing consumers to buy *defendant's* goods or services." 859 F. Supp. at 1536 (emphasis added); *see Coastal Abstract*, 173 F.3d at 735. That limitation also flows from the statutory language and remains valid after *Lexmark*. By referring to representations that a "person" makes "in commercial advertising or promotion," 15 U.S.C. § 1125(a)(1)(B), the Lanham Act clearly refers to commercial speech promoting sales of goods that may fairly be said to be those of that "person," *i.e.*, the defendant. We do not normally think of *third-party* product reviews or endorsements as being that person's "commercial advertising"—at least when they are not done on behalf of the product's manufacturer or seller. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504 n.22 (1984) ("[A] commercial advertiser usually 'seeks to disseminate information about a specific product or service *he himself* provides and presumably knows more about than anyone else.'" (emphasis added) (quoting *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 772 n.24 (1976))). Indeed, the Supreme Court has "squarely held" that third-party product reviews— favorable or unfavorable—are fully protected speech. *Lowe v. SEC*, 472 U.S. 181, 210 n.58 (1985) (citing *Bose*, 466 U.S. at 513).

But in stating that the Lanham Act only reaches advertisements for one's own goods and services, *Gordon & Breach* and *Coastal Abstract* did not thereby strictly limit the

statute's reach just to advertising by manufacturers and distributors *themselves*.  Thus, for example, when an entity acts as an agent of a manufacturer in making a product review, then that entity acts on behalf of the manufacturer and is in that sense advertising its own product.  "[P]aid publicists' speech" about their payor's products *is* commercial speech. *United States v. Wenger*, 427 F.3d 840, 848 (10th Cir. 2005); *see also* Maj. Opin. at 20 ("[P]aid promotion is commercial speech.").  In addition, there may be other endorsers who have such a direct financial stake in specific sales of a product—such as a cut of each sale—that it may likewise be fair to say that they are thereby *advertising* their *own* product. *See*, *e.g.*, *Handsome Brook*, 700 F. App'x at 253, 260–61 (nonprofit organization that certified egg producers as "humane" and that received 5 cents for every 30 dozen eggs sold by certified producers was engaged in commercial advertising by promoting such certified-producer sales).  Each of these scenarios is consistent with *Gordon & Breach*'s common-sense rule that, as used in the Lanham Act, "commercial advertising" connotes speech endorsing the *speaker's* products.

While this speaker's-product limitation on the scope of § 43(a)(1)(B) may not exactly parallel the outermost boundary of what constitutes "commercial speech" under the First Amendment, the overlap is considerable.  We know from *Lowe* and *Bose* that the speaker's connection (or lack of connection) to a product is, at the very least, a critical consideration in determining whether that speaker's comments about that product are "commercial speech" under the First Amendment.  Moreover, the Lanham Act's bright-line limitation to speech about the *speaker's* products stays well within constitutional limits and avoids more difficult questions, such as the extent to which the more expansive conception of "commercial speech" in *Bolger*

may be applied to an entity that is *not* speaking about its own products. In holding that substantive mailers about contraceptives nonetheless qualified as "commercial speech," the Court in *Bolger* addressed only such speech by the *product manufacturer*, *see* 463 U.S. at 67–68; it did not address whether the same looser constitutional standards apply when the speech is made by *other* types of speakers. The majority concludes that *Bolger* does apply in the latter context, and its ensuing application of *Bolger*'s multi-factor test to the *Guide* relies heavily on subjective expectations of indirect economic benefits from speech praising another's products. *See* Maj. Opin. at 17–18. The result is a substantial amount of uncertainty as to the scope of First Amendment protection for product reviews, a result that I find doubtful and disquieting.

In light of these considerations, I am unwilling to overlook the fact that the Lanham Act applies only to commercial advertising about the *speaker's* products. Moreover, even though the district court and the parties have not directly addressed this limitation, they have done so indirectly. The overwhelming focus of both the ruling below and the briefing in this court has been on the strength of various connections between Defendants and Usana and whether those connections are sufficient to render the speech in question "commercial speech" for First Amendment purposes. Given the very substantial overlap between that constitutional "commercial speech" issue and the statutory "speaker's product" issue, I see no reason not to resolve the parties' arguments through their proper statutory lens. And the doctrine of constitutional avoidance—which Defendants have specifically invoked in this court—confirms that we should not disregard any relevant statutory limitation that, by either eliminating or narrowing the constitutional question we must consider, would lessen any constitutional

concerns.  *Cf. Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J. concurring).

I therefore would not address the broader constitutional questions that the majority decides.  Instead, in my view, the more limited question before us is whether Ariix has alleged sufficient facts to show that the *Guide*, or a subset of it, is commercial speech that influences the target audience to purchase goods that are, in some viable sense, those of Defendants.  Ariix has failed to do so.

**B**

The operative complaint alleges that the *Guide*, or at least portions of it, constitute "promotional material that is bought and paid for by Usana" and "coordinated in advance of publication."   This allegation sounds superficially promising, because it seems to suggest that Defendants may have acted on Usana's behalf or at its direction by secretly making, in exchange for compensation, specific changes requested by Usana in its own or competitors' product reviews in the *Guide*.  For the reasons explained earlier, I would agree that, if Defendants covertly acted subject to Usana's advance direction and control in preparing the content of the *Guide*, then Defendants could in that sense be said to be promoting *their own* products by promoting Usana's products.  *See supra* at 32–33.   But Ariix's complaint contains no allegations that would support the view that Defendants are Usana's agents or that Defendants altered or placed specific content in the *Guide*'s reviews at Usana's direction. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   Instead, the complaint's factual allegations establish, at most, that Defendants produced biased reviews in the craven hope that Usana would then act in ways that were economically favorable to Defendants.  That is not enough.

The complaint alleges, for example, that when Usana was rated "number one" in the *Guide*, Usana was willing to pay MacWilliam as a speaker to promote its products, and it also encouraged its sales representatives to purchase the *Guide*. This resulted in "hundreds of thousands of dollars per year" of economic benefit to Defendants. But when Usana shared the top category with other additional companies in 2008, Usana ceased encouraging sales of the book and declined to give MacWilliam speaking engagements. When MacWilliam inquired about these changes, an Usana executive said that "we don't want to stand up and say 'we're one of the five best.' We like the fact that we're number one." When MacWilliam asked if it would "help if Usana is number one in some way," the executive responded, "of course it would help." The complaint alleges that Defendants then came up with a new "Editor's Choice" award and gave it to Usana. Having done so, MacWilliam then approached Usana and was paid $90,000 for a specific tour for Usana the following summer. Defendants thereafter took steps to ensure that Usana would retain the top spot by repeatedly revising their criteria "in order to weight [them] in Usana's favor."

These allegations establish that Usana liked favorable reviews and that Usana promoted the *Guide* and its author when the reviews were distinctly superlative and did not do so when they were not. That does not raise a plausible inference that Defendants, in the *Guide*, were thereby reviewing *their own* products. That Defendants wrote obsequious reviews in the hope that Usana would be pleased and buy more *Guides* or give MacWilliam speaking engagements does not make them Usana's agents in writing those reviews. Nor does it establish that they acted on Usana's behalf or subject to its control in doing so. To be sure, MacWilliam acted as Usana's agent when he did paid

speaking tours expressly promoting Usana's products, but the complaint does not rest on the theory that this open hawking of Usana's products by MacWilliam violated the Lanham Act, and the majority does not endorse any such theory here.   Rather, the complaint's theory is that Defendants violated the Act by writing a biased *Guide* that favored Usana without disclosing Defendants' financial ties to Usana.  But the complaint fails to allege facts showing that, in writing the content of the *Guide*, Defendants had an agreement with Usana that would suffice to make Defendants into Usana's "paid publicists."

The closest that the complaint comes on this score is its allegation that, when MacWilliam learned at one point that another company was going to beat Usana with a "perfect score," he went to Usana and explained that either Usana needed to change its formulas or he needed to change his criteria.  But the complaint is conspicuously devoid of any non-conclusory allegations *about how Usana responded*.  It instead alleges, in the very next sentence, that "*MacWilliam and NutriSearch* have since taken extraordinary steps to ensure that Usana maintains its preeminent status" (emphasis added).   The omission is particularly notable, because the district court's order dismissing the previous version of the complaint had emphasized Ariix's failure to plead facts that would tend to exclude the possibility that Usana simply responded in a lawful and self-interested manner to Defendants' alleged sycophancy.  Lacking such factual allegations, the operative amended complaint lapses into conclusory rhetoric, claiming that Defendants "collude[d]" with Usana and have a "symbiotic relationship that is profitable" for all of them.  But the complaint does not contain any well-pleaded factual allegations supporting an inference that Defendants acted as Usana's paid publicists in writing favorable reviews of Usana's products.

Nor does the complaint allege any other viable alternative theory for concluding that Usana's products are in any relevant sense *Defendants'* products. Ariix does not allege, for example, that Defendants had any kind of "*direct* financial interest in sales*" of Usana products, *Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1017 (3d Cir. 2008) (emphasis added), such as a small cut of each sale, *Handsome Brook*, 700 F. App'x at 259–61. More broadly, nothing in the complaint suggests that Defendants formulated the *Guide* with the hope that consumers of nutritional supplements would respond by making commercial decisions that would directly benefit Defendants financially.

\*          \*          \*

Because Ariix's complaint fails to allege sufficient facts to raise a plausible inference that Defendants were advertising their own products when they rated supplements in the *Guide*, Ariix has failed to state a claim for false advertising under the Lanham Act with respect to the *Guide* or its reviews.

## II

In light of the conclusions set forth above, I do not reach any of the other issues addressed by the majority. Because the district court already allowed an amendment to add additional factual allegations addressing the relationship between Usana and Defendants, I agree with the district court's conclusion that further amendment would be futile. I therefore would affirm the district court's judgment dismissing the complaint with prejudice. I respectfully dissent.