THE HONORABLE JOHN C. COUGHENOUR 
1 
2 
3 
4 
5 
6 
 UNITED STATES DISTRICT COURT 
7 
 WESTERN DISTRICT OF WASHINGTON 
8 AT SEATTLE 
9 CHONG YIM, et al., CASE NO. C18-0736-JCC 
10 
 Plaintiffs, ORDER 
11 v. 
12 CITY OF SEATTLE, 
13 Defendant. 
14 

15 This matter comes before the Court on the parties’ cross motions for summary judgment 
16 (Dkt. Nos. 23, 33). Having thoroughly considered the parties’ briefing and the relevant record, 
17 and oral argument from the parties, hereby GRANTS the City of Seattle’s motion and DENIES 
18 Plaintiffs’ motion for the reasons explained herein. 
19 I. INTRODUCTION 
20 In late 2017, the City of Seattle enacted the Fair Chance Housing Ordinance, Seattle 
21 Municipal Code § 14.09 et seq., which, at its core, prohibits landlords from asking anyone about 
22 prospective or current tenants’ criminal or arrest history and from taking adverse action against 
23 them based on that information.1 A few months after the Ordinance took effect, three landlords 
24 
 1 During the COVID-19 pandemic, the City amended the Ordinance to also prohibit landlords 
25 
 from taking adverse action based on evictions occurring during or shortly after the state of 
26 emergency caused by the pandemic. See S.M.C. § 14.09.026. As a result, the City also renamed 
 the Ordinance the “Fair Chance Housing and Eviction Records Ordinance.” See S.M.C. § 
1 and the Rental Housing Association (“RHA”), a trade group comprised of “over 5,300 landlord 
2 members,” (Dkt. No. 24 at 5), filed the present suit, alleging that the Ordinance violates their 
3 federal and state substantive due process rights and their federal and state free speech rights. 
4 The section of the Ordinance Plaintiffs challenge contains three provisions that the Court 
5 will refer to as the “adverse action provision,” the “requirement provision,” and the “inquiry 
6 provision.” See S.M.C. § 14.09.025(A)(2). The adverse action provision prohibits “any person” 
7 from “tak[ing] an adverse action against a prospective occupant, a tenant, or a member of their 
8 household, based on any arrest record, conviction record, or criminal history.”2 Id. The 
9 requirement provision prohibits “any person” from “[r]equir[ing] disclosure” of “a prospective 
10 occupant, a tenant, or a member of their household[’s] . . . arrest record, conviction record, or 
11 criminal history,” and the inquiry provision prohibits “any person” from “inquir[ing] about” the 
12 same information, even if it is not required. Id. 
13 Plaintiffs argue that the adverse action provision violates their federal and state 
14 substantive due process rights and that the inquiry provision violates their federal and state free 
15 speech rights. (Dkt. No. 48 at 11.) Plaintiffs argue that both provisions are unconstitutional on 
16 their face, and that the Court should prohibit the City from enforcing them against anyone. The 
17 Court will not do so because neither provision violates Plaintiffs’ substantive due process or free 
18 speech rights and Plaintiffs have not shown that the Ordinance is unconstitutional on its face. 
19 II. PROCEDURAL BACKGROUND 
20 The parties stipulated that “discovery and a trial are unnecessary” and that the Court 
21 should resolve this matter based on the parties’ cross motions for summary judgment, which are 
22 based on a stipulated record. (Dkt. Nos. 9 at 2, 24, 33-1–33-13.) The parties further stipulated 
23 
 14.09.005. Because only the criminal history provisions are relevant here, and because the 
24 
 parties use the previous name, the Court refers to the Ordinance as the “Fair Chance Housing 
25 Ordinance.” 
 2 “Adverse action” is defined to include, among other things, refusing to rent to the person, 
26 
 evicting the person, or charging higher rent. S.M.C. § 14.09.010. 
1 that if the Court determines that there is a genuine issue of material fact, it should resolve the 
2 disputed factual issue based on the record before it, without holding a trial. (Dkt. No. 9 at 2–3.) 
3 III. LEGAL STANDARD 
4 “The court shall grant summary judgment if the movant shows that there is no genuine 
5 dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed. R. 
6 Civ. P. 56(a). A fact is material if it “might affect the outcome of the suit under the governing 
7 law,” and a dispute of fact is genuine if “the evidence is such that a reasonable jury could return 
8 a verdict for the nonmoving party.” Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). 
9 IV. DISCUSSION 
10 A. Substantive Due Process 
11 The Fourteenth Amendment of the United States Constitution provides that “No state 
12 shall . . . deprive any person of life, liberty, or property, without due process of law.” U.S. Const. 
13 amend. XIV, § 1. This provision “guards against arbitrary and capricious government action, 
14 even when the decision to take that action is made through procedures that are in themselves 
15 constitutionally adequate.” Sinaloa Lake Owners Ass’n v. City of Simi Valley, 882 F.2d 1398, 
16 1407 (9th Cir. 1989), overruled on other grounds by Armendariz v. Penman, 75 F.3d 1311 (9th 
17 Cir. 1996). The Washington Constitution provides the same protection. See Wash. Const. art. I, 
18 § 3. The Court certified several questions regarding Plaintiffs’ state substantive due process 
19 claims to the Washington Supreme Court, which concluded that “state substantive due process 
20 claims are subject to the same standards as federal substantive due process claims.” Yim v. City 
21 of Seattle, 451 P.3d 694, 696 (Wash. 2019). Therefore, the Court’s analysis of both claims 
22 merges.3 
23 “To establish a substantive due process claim, a plaintiff must, as a threshold matter, 
24 

25 3 The Court agrees with the parties that the Washington Supreme Court’s analysis of federal law 
 in Yim is not binding on this Court and therefore the Court analyzes Plaintiffs’ due process 
26 
 claims independently. 
1 show a government deprivation of life, liberty, or property.” Nunez v. City of L.A., 147 F.3d 867, 
2 871 (9th Cir. 1998). Plaintiffs allege that the City has deprived them of their “right to rent their 
3 property to whom they choose, at a price they choose, subject to reasonable anti-discrimination 
4 measures.”4 (Dkt. No. 1-1 at 3.) The source of this property right is not clear. Plaintiffs originally 
5 cited Washington law, (id), but after the Washington Supreme Court answered the Court’s 
6 certified questions Plaintiffs cited two different U.S. Supreme Court opinions: one that is nearly 
7 one-hundred years old, (see Dkt. No. 70 at 4 n.1 (citing Terrace v. Thompson, 263 U.S. 197, 215 
8 (1923)), and another that was decided well after they filed their complaint, (see Dkt. No. 84 
9 (citing Cedar Point Nursery v. Hassid, 141 S. Ct. 2063 (2021)). But the Supreme Court has made 
10 clear that “[p]roperty interests are not created by the Constitution, ‘they are created and their 
11 dimensions are defined by existing rules or understandings that stem from an independent source 
12 such as state law.’” Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985) (quoting Bd. 
13 of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). Because the City does not dispute 
14 that such a property right exists or that the Ordinance deprives Plaintiffs of that right, the Court 
15 assumes without deciding that the Ordinance deprives Plaintiffs of a property right.5 
16 The parties disagree about the next step of the analysis. Plaintiffs argue that because a 
17 property right is involved, the Court must examine whether the Ordinance “substantially 
18 advances” a legitimate public purpose, (Dkt. Nos. 23 at 24, 48 at 30–32), meaning the Court 
19 must determine whether the Ordinance “is effective in achieving some legitimate public 
20 purpose,” Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 542 (2005). The City argues that the 
21 Court’s analysis should be more deferential, and that it must determine “only whether the 
22 government could have harbored a rational [and legitimate] reason for adopting the law.” (Dkt. 
23 No. 69 at 3.) According to the City, its actual purpose in enacting the Ordinance and the 

24 4 Plaintiffs do not argue that the Ordinance affects the RHA’s property rights, so the Court 
25 understands only the landlord Plaintiffs to assert substantive due process claims. 
 5 The Ordinance does not regulate price, so the Court focuses exclusively on landlords’ alleged 
26 
 right to rent to whom they choose. 
1 Ordinance’s actual effectiveness in achieving that purpose are not relevant to the due process 
2 analysis. (Id. at 9.) The City is correct. 
3 Nearly a century ago, the Supreme Court held that a municipal ordinance does not violate 
4 a property owner’s substantive due process rights unless it is “clearly arbitrary and unreasonable, 
5 having no substantial relation to the public health, safety, morals or general welfare.” Vill. of 
6 Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 395 (1926). The Court has repeatedly 
7 reaffirmed this rule. See, e.g., Nebbia v. People of N.Y., 291 U.S. 502, 537 (1934) (“If the laws 
8 passed are seen to have a reasonable relation to a proper legislative purpose, and are neither 
9 arbitrary nor discriminatory, the requirements of due process are satisfied . . . .”); Exxon Corp. v. 
10 Governor of Md., 437 U.S. 117, 124–25 (1978) (upholding statute that bore “a reasonable 
11 relation to the State’s legitimate purpose” and declining to analyze “the ultimate economic 
12 efficacy of the statute”). Most recently, in Lingle, the Court confirmed that it has “long eschewed 
13 [the] heightened scrutiny” that the substantially advances test requires “when addressing 
14 substantive due process challenges to government regulation.” 544 U.S. at 545. Instead, courts 
15 must defer “to legislative judgments about the need for, and likely effectiveness of, regulatory 
16 actions.” Id. It is no surprise then that the Ninth Circuit has continued to apply the rational basis 
17 test to property-based substantive due process claims after Lingle. See, e.g., N. Pacifica LLC v. 
18 City of Pacifica, 526 F.3d 478, 484 (9th Cir. 2008) (“The irreducible minimum of a substantive 
19 due process claim challenging land use regulation is failure to advance any governmental 
20 purpose.”) (emphasis added). 
21 To determine whether the Ordinance violates Plaintiffs’ substantive due process rights, 
22 the Court must determine whether the Ordinance could advance any legitimate government 
23 purpose. Kawaoka v. City of Arroyo Grande, 17 F.3d 1227, 1234 (9th Cir. 1994) (“In a 
24 substantive due process challenge, we do not require that the City’s legislative acts actually 
25 advance its stated purposes, but instead look to whether ‘the governmental body could have had 
26 no legitimate reason for its decision.’”) (quoting Levald, Inc. v. City of Palm Desert, 998 F.2d 
1 680, 690 (9th Cir. 1993)). The Court need not stray into the hypothetical, however, because the 
2 City’s actual reasons for enacting the statute are legitimate, and, as discussed in detail below, the 
3 Ordinance directly advances those legitimate purposes. See infra Section B(3)(c). Therefore, 
4 with respect to the substantive due process claims, the Court DENIES Plaintiffs’ motion for 
5 summary judgment and GRANTS the City’s motion for summary judgment. 
6 B. Free Speech 
7 Plaintiffs’ central claims are their free speech claims. The parties assume that the scope 
8 of the free speech clause in Washington’s constitution is coextensive with the First Amendment 
9 in this context and the Court will assume the same. (See Dkt. Nos. 23 at 9 n.2, 33 at 13 n.38.) 
10 Before turning to the merits of Plaintiffs’ claims, the Court must first define the scope of their 
11 challenge. 
12 The Court understands Plaintiffs to challenge only the inquiry provision on free speech 
13 grounds.6 That provision prohibits “any person” from “inquir[ing] about . . . a prospective 
14 occupant, a tenant, or a member of their household[’s] . . . arrest record, conviction record, or 
15 criminal history.” S.M.C. § 14.09.025(A)(2). Plaintiffs challenge the inquiry provision on its 
16 face, meaning they request that the Court enjoin the City from enforcing it against anyone, not 
17 just the plaintiffs before the Court. (See Dkt. No. 1-1 at 18–19.) “To succeed in a typical facial 
18 attack, [Plaintiffs] would have to establish ‘that no set of circumstances exists under which [the 
19 Ordinance] would be valid,’ or that [it] lacks any ‘plainly legitimate sweep.’” United States v. 
20 Stevens, 559 U.S. 460, 472 (2010) (internal citations omitted). In the First Amendment context, 
21 however, a plaintiff may assert an overbreadth challenge, which is less demanding than a typical 
22 facial challenge. Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442, 449 n.6 
23 

24 6 To the extent Plaintiffs challenge the requirement provision, the Court concludes that it does 
 not violate the First Amendment because it governs conduct and only incidentally burdens 
25 speech. See Sorrell v. IMS Health, Inc., 564 U.S. 552, 567 (2011) (“[T]he First Amendment does 
 not prevent restrictions directed at commerce or conduct from imposing incidental burdens on 
26 
 speech.”); see also Rumsfeld v. F. for Acad. and Inst’l Rts., Inc., 547 U.S. 47, 62 (2006). 
1 (2008). To succeed on their overbreadth challenge, Plaintiffs must show that “a substantial 
2 number of [the Ordinance’s] applications are unconstitutional, judged in relation to [its] plainly 
3 legitimate sweep.” Stevens, 559 U.S. at 473 (quoting Wash. State Grange, 552 U.S. at 449 n.6). 
4 Plaintiffs’ theory has shifted over the course of the litigation. In their opening brief, 
5 Plaintiffs assert only a traditional facial challenge and do not mention the overbreadth doctrine. 
6 (See Dkt. No. 23.) Twenty-one pages into their combined reply and response to the City’s 
7 motion, however, Plaintiffs introduce a two-paragraph overbreadth argument for the first time. 
8 (See Dkt. No. 48 at 28–29.) Ordinarily “arguments raised for the first time in a reply brief are 
9 waived,” Graves v. Arpaio, 623 F.3d 1043, 1048 (9th Cir. 2010), but the Court will consider the 
10 overbreadth argument here because the brief in which it was introduced is also Plaintiffs’ 
11 response to the City’s motion for summary judgment and the City had an opportunity to respond 
12 to it. 
13 Although Plaintiffs purport to challenge the inquiry provision in its entirety, the Court 
14 concludes that Plaintiffs lack Article III standing to challenge the inquiry provision with respect 
15 to inquiries about current tenants.7 To establish Article III standing to challenge the tenants 
16 provision, Plaintiffs must demonstrate that they have suffered an injury in fact that is fairly 
17 traceable to that provision and that is likely to be redressed by a favorable decision. Lujan v. 
18 Defs. of Wildlife, 504 U.S. 555, 560–61 (1992); see also California v. Texas, 141 S. Ct. 2104, 
19 2119–20 (2021) (holding that a plaintiff lacks standing to challenge a statutory provision if he or 
20 she cannot demonstrate that that particular provision caused his or her injuries). 
21 In the First Amendment context, a plaintiff can establish an injury in fact by showing that 
22 a statute chilled his or her speech. Libertarian Party of L.A. Cnty. v. Bowen, 709 F.3d 867, 870 
23 

24 7 The parties purport to stipulate to Plaintiffs’ standing, (Dkt. No. 24 at 3), but “consent cannot 
 confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, 
25 § 2,” Commodity Future Trading Comm’n v. Schor, 478 U.S. 833, 851 (1986). See also Sosna v. 
 Iowa, 419 U.S. 393, 398 (1975) (parties “may not by stipulation invoke the judicial power of the 
26 
 United States”). 
1 (9th Cir. 2013). A plaintiff may also establish an injury in fact by “demonstrat[ing] a realistic 
2 danger of sustaining a direct injury as a result of the statute’s operation or enforcement.” Babbitt 
3 v. United Farm Workers Nat’l Union, 442 U.S. 289, 298 (1979). To do so, the plaintiff must 
4 demonstrate a concrete “intention to engage in a course of conduct arguably affected with a 
5 constitutional interest, but proscribed by a statute, and there exists a credible threat of 
6 prosecution thereunder.” Id.; Thomas v. Anchorage Equal Rts. Comm’n, 220 F.3d 1134, 1139 
7 (9th Cir. 2000). “[N]either the mere existence of a proscriptive statute nor a generalized threat of 
8 prosecution” suffices. Thomas, 220 F.3d at 1139. In sum, to have standing to challenge the 
9 tenants provision, Plaintiffs must show that the statute has already chilled their speech or that 
10 they have concrete plans to ask current tenants about their criminal history in the future but have 
11 refrained because of a realistic risk of the City enforcing the Ordinance against them. At 
12 summary judgment, Plaintiffs must establish standing with “affidavit[s] or other evidence.” 
13 Lujan, 504 U.S. at 561. 
14 Plaintiffs have not met their burden. The landlord plaintiffs do not allege that they have 
15 ever asked a current tenant about his or her criminal history in the past, nor do they allege that 
16 they intend to do so in the future. Further, nothing in the record shows that the RHA has ever run 
17 a background check on a current tenant or that it has concrete plans to do so in the future. Indeed, 
18 the fact that the RHA requires landlords to submit a “rental applicant’s application” before 
19 running a background check suggests that the RHA runs background checks only on prospective 
20 occupants.8 (Dkt. No. 24 at 6.) Therefore, none of the plaintiffs have demonstrated that they have 
21 standing to challenge the tenants provision. Accordingly, the Court DISMISSES Plaintiffs’ free 
22 

 8 To be sure, it is possible that some landlords require current tenants to apply to renew their 
23 
 leases each year and that these landlords purchase background reports regarding these tenants 
24 from the RHA, but nothing in the record shows that to be the case, and the Court cannot 
 conclude that the RHA has standing based on speculation. Lujan, 504 U.S. at 561. Further, even 
25 if Plaintiffs had produced this evidence, they would have standing only if these individuals 
 would fall under the tenants provision instead of or in addition to the prospective occupants 
26 
 provision. 
1 speech claims aimed at the tenants provision, and the Court’s analysis of Plaintiffs’ free speech 
2 claims will focus exclusively on the prospective occupants provision. 
3 1. The Ordinance Regulates Speech and the First Amendment Applies. 
4 The City argues that the inquiry provision does not implicate the First Amendment 
5 because it regulates conduct, not speech. (See Dkt. Nos. 33 at 14–16, 50 at 5–6.) The Court 
6 disagrees. The inquiry provision directly regulates speech: it prohibits “any person” from 
7 “inquir[ing] about . . . a prospective occupant, a tenant, or a member of their household[’s] . . . 
8 arrest record, conviction record, or criminal history.” S.M.C. § 14.09.025(A)(2). Therefore, it 
9 implicates the First Amendment because it regulates what people can ask, not just what they can 
10 do. To the extent there is any doubt about the effect of the Ordinance, its disclaimer provision 
11 dispels it by requiring landlords to state on their rental applications “that the landlord is 
12 prohibited from . . . asking about . . . any arrest record, conviction record, or criminal history 
13 . . . .” S.M.C. § 14.09.020 (emphasis added). 
14 The inquiry provision is a content-based restriction on speech because it prohibits 
15 landlords from asking about certain content: prospective occupants’ criminal history. See Berger 
16 v. City of Seattle, 569 F.3d 1029, 1051 (9th Cir. 2009). Therefore, it is subject to heightened 
17 scrutiny. Dex Media West, Inc. v. City of Seattle, 696 F.3d 952, 957 (9th Cir. 2012). The level of 
18 scrutiny turns on the nature of the regulated speech. Id. If the Ordinance governs non-
19 commercial speech, as Plaintiffs argue, the provision is subject to strict scrutiny. Id. If the 
20 Ordinance governs commercial speech, as the City argues, the provision is subject to 
21 intermediate scrutiny. Id. 
22 2. At its Core, the Inquiry Provision Regulates Commercial Speech. 
23 The Court starts with the core of the inquiry provision, which prohibits landlords from 
24 asking prospective occupants or other entities, like the RHA, about prospective occupants’ 
25 criminal histories. See Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 484–85 (1989) (“It 
26 is not . . . generally desirable to proceed to an overbreadth issue unnecessarily—that is, before it 
1 is determined that the statute would be valid as applied.”). Plaintiffs argue that the inquiry 
2 provision does not regulate commercial speech because “the commercial speech doctrine applies 
3 only to ‘speech which does no more than propose a commercial transaction,’” (Dkt. No. 48 at 14 
4 (quoting Bolger v. Young Drug Prods. Corp., 463 U.S. 60, 66 (1983)), and “criminal history is 
5 not a proposal to engage in a commercial transaction,” (Dkt. No. 48 at 15). This argument 
6 suggests Plaintiffs misunderstand the commercial speech doctrine. 
7 Plaintiffs are correct that “the core notion of commercial speech” is “speech which does 
8 no more than propose a commercial transaction.” Bolger, 463 U.S. at 66 (quoting Va. State Bd. 
9 of Pharm. v. Va. Citizens Consumer Council, Inc., 425 U.S. 748, 762 (1976)). But when 
10 evaluating whether a statute governs commercial speech, courts look to the context in which the 
11 speech appears, not just to the speech in isolation. See, e.g., Bolger, 463 U.S. at 67–68 
12 (explaining that speech about public issues “in the context of commercial transactions” is entitled 
13 to less First Amendment protection than the same speech in other contexts). Thus, the Supreme 
14 Court has held that a rule governing the use of CPA and CFP designations in accountant 
15 advertising regulated commercial speech even though the terms “CFA” and “CFP,” in isolation, 
16 do not propose a commercial transaction. See Ibanez v. Fla. Dep’t of Bus. and Pro. Regul., 512 
17 U.S. 136, 142 (1994). Similarly, the Ninth Circuit has held that statutes regulating companies’ 
18 use of words like “biodegradable” and “recyclable” in their advertising and physicians’ use of 
19 the term “board certified” governed commercial speech, even though the words “biodegradable,” 
20 “recyclable,” and “board certified” do not propose commercial transactions. See Am. Acad. of 
21 Pain Mgmt. v. Joseph, 353 F.3d 1099, 1106 (9th Cir. 2004) (board certified); Assoc. of Nat’l 
22 Advertisers, Inc. v. Lungren, 44 F.3d 726, 728–29 (9th Cir. 1994) (biodegradable, recyclable); 
23 see also Rubin v. Coors Brewing Co., 514 U.S. 476, 481–82 (1995) (assuming that “information 
24 on beer labels constitutes commercial speech”). These cases demonstrate that when determining 
25 whether speech proposes a commercial transaction, the Court must look to the context in which 
26 the speech appears, not just to the speech in isolation. 
1 Further, “speech that does not propose a commercial transaction on its face can still be 
2 commercial speech.” Ariix, LLC v. NutriSearch Corp., 985 F.3d 1107, 1115 (9th Cir. 2021). For 
3 example, in Bolger itself the Supreme Court held that “an eight-page pamphlet discussing at 
4 length the problem of venereal disease and the use and advantages of condoms in aiding the 
5 prevention of venereal disease” was commercial speech even though it did not expressly propose 
6 a transaction and the only commercial element was a statement at the bottom of the last page 
7 explaining that “the pamphlet [was] contributed as a public service by Youngs, the distributor of 
8 Trojan-brand prophylactics.” 463 U.S. at 62 n.4, 68. In Ariix, the Ninth Circuit held that a book 
9 that purported to “describe[] the science of nutritional supplements and provide[] [objective] 
10 ratings for various nutritional supplement products” was commercial speech because it was 
11 actually “a sophisticated marketing sham” that promoted a particular manufacturer’s products 
12 but did not expressly propose a commercial transaction. 985 F.3d at 1115, 1118. And in Jordan 
13 v. Jewel Food Stores, Inc., the Seventh Circuit held that advertisements that promote “brand 
14 awareness or loyalty” are commercial speech even if they do not expressly propose a transaction. 
15 743 F.3d 509, 518 (7th Cir. 2014). 
16 “Because of the difficulty of drawing clear lines between commercial and non-
17 commercial speech, the Supreme Court in Bolger outlined three factors to consider.” Ariix, 985 
18 F.3d at 1115. There, the Court considered whether the speech (1) occurred in the context of an 
19 advertisement, (2) referred to a specific product, and (3) whether the speaker spoke primarily 
20 because of his or her economic motivation. See Bolger, 463 U.S. at 671; Ariix, 985 F.2d at 1116–
21 17. The “Bolger factors are important guideposts, but they are not dispositive.” Ariix, 985 F.3d at 
22 1116. Speech may be commercial speech even if fewer than all three factors are present. See 
23 Bolger, 463 U.S. at 67 n.14. 
24 With these principles in mind, the Court turns to the core of the statute here.9 A 

25 
 9 The Supreme Court has also recognized a second, broader category of commercial speech: 
26 speech “related solely to the economic interests of the speaker and its audience.” Central Hudson 
 Gas & Elec. Corp. v. Pub. Serv. Comm’n, 447 U.S. 557, 561 (1980). This second definition has 
1 prospective occupant is “any person who seeks to lease, sublease, or rent real property.” S.M.C. 
2 § 14.09.010. Most instances in which a landlord asks someone seeking to rent property about his 
3 or her criminal history are commercial speech. For example, the record suggests that some 
4 landlords included questions about criminal history on their rental applications before the 
5 Ordinance was enacted.10 Rental applications fall squarely within the core notion of commercial 
6 speech: they are documents that propose a commercial transaction between a landlord and a 
7 prospective occupant. Therefore, when the City regulates what landlords can ask in their rental 
8 applications, it regulates commercial speech. Landlords also engage in commercial speech when 
9 they ask prospective occupants about their criminal history while showing them the property or 
10 discussing its features and the terms of the rental. In those circumstances, the purpose of the 
11 speech is to advertise a particular product—property rental—and the landlord’s motivation for 
12 speaking is primarily economic. Thus, many core applications of the statute constitute 
13 commercial speech. See, e.g., Campbell v. Robb, 162 F. App’x 460, 469 (6th Cir. 2006) (holding 
14 that “a statement made by a landlord to a prospective tenant describing the conditions of rental” 
15 falls within the core definition of commercial speech); S.F. Apartment Ass’n v. City and Cnty. of 
16 S.F., 881 F.3d 1169, 1176 (9th Cir. 2018) (holding that “a discussion between a landlord and a 
17 tenant about the possibility of entering into a buyout agreement is commercial speech”); see also 
18 Greater Phila. Chamber of Com. v. City of Phila., 949 F.3d 116, 137 (3d Cir. 2020) (holding that 
19 City ordinance prohibiting employers from asking applicants about their salary history regulates 
20 

21 been criticized from the start, see id. at 579–80 (Stevens, J. concurring in the judgment) (arguing 
 that this definition of commercial speech is “too broad”), but the Supreme Court has not 
22 expressly overruled this portion of Central Hudson so lower courts must continue to apply it. 
 Nunez-Reyes v. Holder, 646 F.3d 684, 692 (9th Cir. 2011). Nevertheless, because most, if not all, 
23 of the speech the inquiry provision regulates falls within the first definition, the Court need not 
 examine this broader definition. 
24 
 10 According to the stipulated facts, after the Ordinance was enacted, the RHA “created a new 
25 model application for tenancy for Seattle Landlord members that . . . omits questions about 
 criminal history.” (Dkt. No. 24 at 7.) The previous model application is not in the record, but the 
26 
 clear implication is that the previous version asked about criminal history. 
1 commercial speech). 
2 Plaintiffs argue that many landlords seek criminal history information from the RHA, and 
3 that speech between landlords and the RHA is not commercial speech because the RHA is not a 
4 party to the underlying rental transaction between the landlord and tenant. (See Dkt. No. 48 at 
5 17.) But that framing overlooks that the only speech the Ordinance restricts between a landlord 
6 and the RHA is a proposal to engage in a separate commercial transaction—the purchase of a 
7 background report. 
8 The RHA’s website advertises various “Screening Products” landlords can purchase, 
9 including a “Background Screening” package for “$25 per applicant” and a “Seattle Premium” 
10 screening package for “$45 per applicant.”11 See Rental Housing Association of WA, Screening 
11 Products, RHAWA.org (July 6, 2021, 8:10 AM), https://www.rhawa.org/tenant-screening##. A 
12 landlord wishing to purchase a background report may do so by logging onto the RHA’s online 
13 system and entering an “applicant’s name, date of birth, and social security number” and 
14 submitting “the rental applicant’s application” and “the applicant’s consent to be screened.” 
15 (Dkt. No. 24 at 6–7.) In addition, the landlord must pay for the report.12 After a landlord 
16 purchases a report, the RHA obtains a background report from a company called Innovative 
17 Software Solutions and provides a copy to the landlord without any “alter[ation] or re-
18 format[ting] by the RHA.” (Id.) Landlords may also request the report by e-mail or by fax. (Id. at 
19 6.) In short, landlords pay the RHA to serve as a middleman between them and Innovative 

20 11 The Court takes judicial notice of the website pursuant to Federal Rule of Evidence 201(c)(1) 
21 because the parties cannot reasonably question the accuracy of the RHA’s website regarding this 
 point. Fed. R. Evid. 201(b)(2). 
22 12 The stipulated facts omit the fact that landlords must pay for the reports, and Plaintiffs’ 
 briefing characterizes the communication between a landlord and the RHA as a “request” or 
23 
 “query.” (Dkt. Nos. 24 at 5–7, 48 at 10.) Plaintiffs’ briefing also refers generically to “screening 
24 companies . . . offer[ing] information for a price,” (Dkt. No. 23 at 13), and landlords purchasing 
 background reports, (Dkt. No. 48 at 15), but studiously avoids drawing attention to the fact that 
25 the RHA sells background reports. Whether that framing was intentional or inadvertent, there is 
 no dispute that to obtain a background report from the RHA, a landlord must purchase the report, 
26 
 not just “request” criminal history information. 
1 Software Solutions. 
2 The speech the Ordinance covers—a landlord specifying the background check he or she 
3 wishes to purchase—is quintessential commercial speech. It boils down to the landlord asking, 
4 “Can I purchase a background report for this particular applicant?” Therefore, these applications 
5 of the statute also regulate commercial speech. 
6 3. The Core of the Statute is Constitutional. 
7 When evaluating the permissibility of government restrictions on commercial speech, the 
8 Court must evaluate four factors. First, the Court must determine whether the speech concerns 
9 unlawful activity or is misleading. Central Hudson, 447 U.S. at 566. If so, it is not entitled to 
10 First Amendment protection and the government may ban it “without further justification.” 
11 Edenfield v. Fane, 507 U.S. 761, 768 (1993). If not, the government may regulate the speech if it 
12 satisfies the following three-part test: “First, the government must assert a substantial interest in 
13 support of the regulation; second, the government must demonstrate that the restriction on 
14 commercial speech directly and materially advances that interest; and third, the regulation must 
15 be ‘narrowly drawn.’” Fla. Bar v. Went for It, Inc., 515 U.S. 618, 624 (1995) (quoting Central 
16 Hudson, 447 U.S. at 564–65). 
17 a. The Ordinance Does Not Regulate Speech that is Misleading or that Concerns Unlawful 
18 Activity. 
19 The inquiry provision does not target misleading speech. Indeed, the central purpose of 
20 the Ordinance is to prevent landlords from learning and using true information about prospective 
21 occupants’ criminal histories. The Ordinance also does not regulate speech concerning unlawful 
22 activity. That limitation “has traditionally focused on . . . whether the speech proposes an illegal 
23 transaction . . . instead of whether the speech is associated with unlawful activity.” Valle Del Sol, 
24 Inc. v. Whiting, 709 F.3d 808, 821 (9th Cir. 2013). The speech at issue here does not propose an 
25 illegal transaction. 
26 b. The City’s Interests in Reducing Barriers to Housing for People with Criminal Records 
1 and Combatting Racial Discrimination in Housing are Substantial. 
2 When determining whether the government’s interest in regulating commercial speech is 
3 substantial, the Court may consider only “the interests the [government] itself asserts.” 
4 Edenfield, 507 U.S. at 768. In other words, the Court may not supply hypothetical interests that 
5 the government could have but did not offer. Id. Further, the Court need not accept the interests 
6 the government offers “if it appears that the stated interests are not the actual interests served by 
7 the restriction.” Id. 
8 The City argues the Ordinance advances two interests: “reduc[ing] barriers to housing 
9 faced by people with criminal records and . . . lessen[ing] the use of criminal history as a proxy 
10 to discriminate against people of color disproportionately represented in the criminal justice 
11 system.”13 (Dkt. No. 33 at 20.) Plaintiffs all but concede that these interests are substantial, and 
12 the Court agrees that they are. 
13 Plaintiffs appear to argue that the Court should not consider the City’s professed interest 
14 in combatting racial discrimination because that interest did not actually motivate the City in 
15 enacting the Ordinance. (See Dkt. No. 48 at 8–9 (arguing that “[r]acial discrimination is not the 
16 issue here”).) However, the Ordinance’s recitals identify “racial inequities in the criminal justice 
17 system [that] are compounded by racial bias in the rental applicant selection process” as one of 
18 the reasons the City enacted the Ordinance. (Dkt. 33-12 at 57.) Further, the record shows that the 
19 City was concerned with racial discrimination when it was considering the legislation. In May 
20 2017, the Director of Seattle’s Office for Civil Rights sent a letter to the City Council’s Civil 
21 Rights Committee that identified “Racial equity” as “Goal 2” of the proposed legislation. (Dkt. 
22 No. 33-6 at 19.) Two months later, the Office for Civil Rights moved “Racial equity” to “Goal 
23 1.” (Dkt. No. 33-7 at 7.) Plaintiffs do not cite any evidence suggesting that the City’s professed 
24 
 13 Although the City does not state it as clearly, the City advances a third interest: counteracting 
25 the disparate impact the use of criminal history in housing decisions has on people of color, even 
 absent intentional discrimination. (See, e.g., Dkt. No. 33 at 8–9.) Because the Court concludes 
26 
 the other two interests are substantial, the Court need not examine this third interest. 
1 interest in combatting racial discrimination is just a post hoc litigating position. Therefore, there 
2 is no genuine dispute that one of the reasons the City enacted the Ordinance was to combat racial 
3 discrimination.14 
4 Plaintiffs also argue that the Ordinance’s limited exemption for federally funded housing 
5 demonstrates that both of the City’s proffered interests are pretextual and that its actual purpose 
6 in enacting the Ordinance was to burden private landlords while advantaging City-owned public 
7 housing. (See Dkt. Nos. 23 at 14–17, 48 at 23–25.) This argument strains credulity. While it is 
8 true that a statute’s underinclusiveness could raise “doubts about whether the government is in 
9 fact pursuing the interest it invokes,” the narrow exemption Plaintiffs complain about does not. 
10 Brown v. Ent. Merchs. Ass’n, 564 U.S. 786, 802 (2011). That exemption provides: 
11 This Chapter 14.09 shall not apply to an adverse action taken by landlords of 
 federally assisted housing subject to federal regulations that require denial of 
12 
 tenancy, including but not limited to when any member of the household is 
13 subject to a lifetime sex offender registration requirement under a state sex 
 offender registration program and/or convicted of manufacture or production of 
14 methamphetamine on the premises of federally assisted housing. 
15 S.M.C. § 14.09.115(B). Although the City likely intended it to do so, this provision does not 
16 actually exempt federally funded public housing providers from the inquiry provision, which is 
17 the only provision Plaintiffs challenge on free speech grounds. It states only that the Chapter 
18 does not apply “to an adverse action taken by” a public housing provider; it never says that the 
19 Chapter does not apply to an inquiry by the provider. The provision that appears to exempt 
20 federally funded public housing providers from the inquiry provision is the first exemption, 
21 which provides that the Ordinance “shall not be interpreted or applied to diminish or conflict 
22 with any requirements of state or federal law.” S.M.C. § 14.09.115(A). Regardless, both 
23 provisions support the City’s explanation that it sought to avoid enacting an Ordinance that could 
24 be preempted by federal law; they do not show that the City intended to burden private landlords 
25 
 14 To the extent there is a genuine dispute, the Court resolves the dispute in favor of the City and 
26 
 finds that one of the reasons the City enacted the Ordinance was to combat racial discrimination. 
1 while advantaging publicly funded housing. (See Dkt. No. 50 at 10.) 
2 c. The Ordinance Directly Advances the City’s Interests in Reducing Barriers to Housing 
3 for People with Criminal Records and Combatting Racial Discrimination. 
4 The City bears the burden of showing that the Ordinance directly advances its proffered 
5 interests. Edenfield, 507 U.S. at 770. “This burden is not satisfied by mere speculation or 
6 conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech 
7 must demonstrate that the harms it recites are real and that its restriction will in fact alleviate 
8 them to a material degree.” Id. at 770–71. The City’s burden is not a heavy one. The City must 
9 show only that it did not enact the Ordinance “based on mere ‘speculation and conjecture.’” 
10 Lorillard Tobacco Co. v. Reilly, 533 U.S. 525, 561 (2001) (quoting Edenfield, 507 U.S. at 770). 
11 When making that determination the Court’s role is not “to reweigh the evidence de novo, or to 
12 replace [the City’s] factual predictions with [its] own.” Turner Broad. Sys., Inc. v. FCC, 512 U.S. 
13 622, 666 (1994). It is only to ensure that “the municipality’s evidence . . . fairly support[s] the 
14 municipality’s rationale for its ordinance.” City of L.A. v. Alameda Books, Inc., 535 U.S. 425, 
15 438 (2002). 
16 The Supreme Court has not provided detailed guidance in a commercial speech case 
17 about what kind evidence is required. At one end of the spectrum, the Court held in Edenfield 
18 that the government fails to meet its burden when it offers “no evidence or anecdotes in support 
19 of its restriction.” Fla. Bar, 515 U.S. at 628 (characterizing Edenfield). At the other end of the 
20 spectrum, the Court held in Florida Bar that “a 106-page summary of [a] 2-year study” that 
21 contained “both statistical and anecdotal” evidence supporting the government’s conclusion 
22 sufficed. Id. at 626–29. Plaintiffs suggest that Florida Bar set the constitutional floor, and that 
23 the Court must strike down the Ordinance unless the City provides evidence similar to the 106-
24 page summary of the study in that case. (See Dkt. No. 48 at 19.) The Court disagrees. 
25 The Supreme Court has held that “the validity of restrictions on commercial speech 
26 should not be judged by standards more stringent than those applied to expressive conduct . . . or 
1 to relevant time, place, or manner restrictions.” United States v. Edge Broad. Co., 509 U.S. 418, 
2 429 (1993). Thus, when faced with gaps in its commercial speech jurisprudence, the Court has 
3 looked to those “other First Amendment contexts” for guidance. Fla. Bar, 515 U.S. at 628; see 
4 also Edge Broad., 509 U.S. at 429–31; Fox, 492 U.S. at 477–79. In Alameda Books, Justice 
5 O’Connor, writing for four justices, explained that the government is not required to justify a 
6 time, place, or manner restriction with “empirical data” because a “municipality considering an 
7 innovative solution may not have data that could demonstrate the efficacy of its proposal because 
8 the solution would, by definition, not have been implemented previously.” 535 U.S. 425, 439–40 
9 (2002). Justice Kennedy concurred in the judgment and in the plurality’s analysis of “how much 
10 evidence is required,” id. at 449, ultimately concluding that “a city must have latitude to 
11 experiment, at least at the outset, and that very little evidence is required,” id. at 451. 
12 Accordingly, in addition to or instead of empirical data, the government may rely on anecdotes, 
13 “history, consensus, and ‘simple common sense.’” Fla. Bar, 515 U.S. at 628 (quoting Burson v. 
14 Freeman, 504 U.S. 191, 211 (1992). 
15 i. The Ordinance Directly Advances the City’s Interest in Reducing Barriers to Housing 
16 for Individuals with Criminal Records. 
17 Plaintiffs concede that the record demonstrates “that many people have criminal records, 
18 that such records are disproportionately held by minorities, that stable housing helps these 
19 individuals to re-integrate into society, and that those with a criminal history tend to struggle 
20 with housing.” (Dkt. No. 48 at 19.) Plaintiffs argue, however, that the City has not shown that the 
21 Ordinance directly advances its interest in reducing barriers to housing for people with criminal 
22 records because the record does not show “that landlords frequently reject potential tenants 
23 solely because of their criminal records.” (Id.) 
24 Before turning to the record, the Court makes two observations. First, the City is not 
25 required to show that landlords reject potential tenants “solely” because of their criminal records. 
26 If a prospective occupant’s criminal record is one of several factors that contributes to a 
1 landlord’s decision to refuse to rent to him, the City could reasonably conclude that the 
2 Ordinance would materially reduce barriers to housing for those with criminal records. Second, 
3 the City is not required to show that landlords reject applicants based on criminal history 
4 “frequently.” While the City must show that housing discrimination against individuals with 
5 criminal records is real, the City is not required to wait for some threshold number of residents to 
6 face discrimination before acting. With these clarifications, the Court turns to the record, which 
7 contains both empirical and anecdotal evidence demonstrating that some landlords in Seattle 
8 rejected potential tenants based on their criminal records before the Ordinance was enacted.15 
9 First, the City cites to a 1997 study in which the author surveyed ex-offenders and 
10 property managers in Seattle about barriers to housing for people released from prison. See 
11 Jacqueline Helfgott, Ex-offender Needs Versus Community Opportunity in Seattle, Washington, 
12 61 Fed. Probation 12 (1997). Out of 196 property managers surveyed, 43% “said that they would 
13 be inclined to reject an applicant with a criminal conviction.” Id. at 20. The most common reason 
14 property managers were inclined to reject applicants with criminal records was to ensure the 
15 safety of the community, and the second most common reason was that “ex-offenders are not 
16 wanted on the property or in the neighborhood because they have bad values.” Id. One landlord 
17 commented, “I don’t like these people. They should all stay in jail.” Id. This finding was 
18 consistent with the survey of ex-offenders, who reported that “housing was the[ir] most difficult 
19 need to meet,” in part, because of “discrimination as a result of ex-offender status.” Id. at 16. 
20 Second, the City considered anecdotal evidence from members of the public. On May 23, 
21 2017, the City heard from a social worker assisting individuals in a law enforcement diversion 
22 program who testified that “a majority” of the “over 400” people in the program are “unable to 
23 access the rental market because of their criminal histories.” Civil Rights, Utilities, Economic 
24 

25 15 Because the three categories of evidence the Court examines suffice to show that the inquiry 
 provision directly advances the City’s interests, the Court need not examine every piece of 
26 
 evidence the City considered before enacting the Ordinance. 
1 Development & Arts Committee 5/23/17, SEATTLE CHANNEL (May 23, 2017), 
2 http://www.seattlechannel.org/mayor-and-council/city-council/2016/2017-civil-rights-utilities-
3 economic-development-and-arts-committee/?videoid=x76441 (28:00–30:04). She reported that 
4 “on a daily basis” she has “conversations with landlords who say, ‘We don’t accept individuals 
5 here with any drug conviction. We don’t accept individuals here with any theft conviction.’” Id. 
6 at 28:23–28:34. A housing case manager with Catholic Community Services whose “job boils 
7 down to calling private landlords and asking if they’re willing to rent to someone with [certain] 
8 conviction[s],” id. at 24:01–24:18, reported that although Catholic Community Services “offers a 
9 guaranteed payment of up to a certain dollar amount for landlords during a certain period of time 
10 . . . it is still extremely difficult for [the organization] to house the people [it] work[s] with, with 
11 criminal backgrounds,” Civil Rights, Utilities, Economic Development & Arts Committee 
12 7/13/17, SEATTLE CHANNEL (May 23, 2017), http://www.seattlechannel.org/mayor-and-
13 council/city-council/2016/2017-civil-rights-utilities-economic-development-and-arts-
14 committee/?videoid=x78912 (1:50:18–1:50:53). The City also heard from individuals who 
15 testified that they had been denied housing based on their criminal histories. (See Dkt. No. 34 at 
16 5.) 
17 Third, the City was aware that some landlords were asking prospective occupants about 
18 their criminal history. See Dkt. No. 33-12 at 56; see also Helfgott at 20 (finding that 67% of 
19 property managers surveyed “indicated that they inquire about criminal history on rental 
20 applications”). Landlords do not often include questions on their rental applications just because 
21 they are curious, and the City was entitled to use common sense to infer that the reason landlords 
22 were asking for that information during the application process was to use it to screen applicants. 
23 Plaintiffs argue the City could not have reasonably concluded that any landlords had 
24 refused to rent to people based on their criminal history because the evidence it considered 
25 shows only “correlation, not causation” and did not “control for . . . other variables,” such as 
26 limited credit history, that might be causing individuals with criminal records to struggle to 
1 secure housing. (Dkt. No. 48 at 22.) This argument is not persuasive. 
2 First, in Alameda Books the Supreme Court held that the government may rely on 
3 evidence that is “consistent with” the government’s theory and it is not required to “prove that its 
4 theory is the only one that can plausibly explain the data.” See 535 U.S. at 435–39. In other 
5 words, the government is not required to isolate the other variables and conclusively establish 
6 that its theory about why a particular social problem is occurring is the only cause before 
7 legislating. See id. at 436–37 (holding that the government “does not bear the burden of 
8 providing evidence that rules out every theory . . . that is inconsistent with its own.”). That 
9 alternative theories may also explain the evidence does not render the Ordinance 
10 unconstitutional. 
11 Second, the City did consider evidence showing that some landlords took adverse action 
12 against prospective occupants based on their criminal history. The City heard testimony from 
13 people who were told directly by landlords that they would not rent to people who had been 
14 convicted of certain crimes. It also considered the Helfgott study, which reported that the two 
15 primary reasons landlords were not inclined to rent to individuals with criminal histories were to 
16 ensure the safety of the community and because people with criminal records were not welcome 
17 because they have bad values. Therefore, although it was not required, the City considered 
18 evidence showing that criminal history itself is a barrier to housing, even when considered in 
19 isolation from other variables like credit history. 
20 Plaintiffs complain that the evidence the City considered is not reliable because the 
21 public comments were “unsworn” and the Helfgott study is “dated” and has “a small sample 
22 size.” (Dkt. No. 48 at 19, 21.) But the Supreme Court has not limited the kind of evidence a 
23 legislature may consider. In fact, it has expressly rejected some of the arguments Plaintiffs make 
24 now. For instance, in Florida Bar, the Court held, over the dissent’s objection, that the 
25 government was entitled to rely on a report that summarized survey results with “few indications 
26 of the sample size . . . and no copies of the actual surveys employed.” 515 U.S. at 628. And in 
1 Alameda Books, the Court held that the government was entitled to rely on a survey that was 
2 several years old. 535 U.S. at 430. At bottom, the Court’s role is to determine whether the 
3 legislature could have reasonably concluded from the evidence before it that prohibiting 
4 landlords from asking about criminal history would materially advance its interest in reducing 
5 barriers to housing for people with criminal histories. Based on the evidence above, the City’s 
6 conclusion was reasonable. 
7 ii. The Ordinance Directly Advances the City’s Interest in Combatting Racial 
8 Discrimination in Housing. 
9 Plaintiffs do not argue that the Ordinance fails to directly advance the City’s interest in 
10 combatting racial discrimination and the record shows that it does. In 2014, Seattle’s Office for 
11 Civil Rights conducted fair housing testing by having “paired testers posing as prospective 
12 renters . . . measure the differences in the services they received from leasing agents, as well as 
13 information about vacancies, rental rates, and other conditions.” Press Release, Seattle Office for 
14 Civil Rights, City Files Charges Against 13 Property Owners for Alleged Violations of Rental 
15 Housing Discrimination (June 9, 2015), 
16 https://www.seattle.gov/Documents/Departments/CivilRights/socr-pr-060915.pdf. “The matched 
17 pairs of testers had similar rental profiles in every respect except for their race or disability.” Id. 
18 Even so, “African American and Latino testers were told about criminal background and credit 
19 history checks more frequently than the white testers.” Id. In 2017, as the City Council was 
20 developing the Ordinance, the Director of Seattle’s Office for Civil Rights shared this 
21 information with the Council, noting that, “[i]n some cases, African Americans were told they 
22 would have to undergo a criminal record check when similarly situated white counterparts were 
23 not.” (Dkt. Nos. 33-6 at 19, 33-7 at 8.) The City could reasonably conclude from this evidence 
24 that some landlords were using criminal history as a pretext for racial discrimination and that 
25 prohibiting landlords from considering criminal history would reduce racial discrimination. 
26 4. There is a Reasonable Fit Between the Inquiry Provision and the City’s Objectives. 
1 To justify the inquiry provision, the City must establish a “reasonable fit” between that 
2 provision and the City’s objectives. Fox, 492 U.S. at 480. To satisfy this standard, the 
3 government must show that the fit between the ends it seeks and the means it used “is not 
4 necessarily perfect, but reasonable; that [the government’s approach] represents not necessarily 
5 the single best disposition but one whose scope is ‘in proportion to the interest served.’” Id. 
6 (quoting In re R.M.J., 455 U.S. 191, 203 (1982)). One “relevant consideration in determining 
7 whether the ‘fit’ between ends and means is reasonable” is whether “there are numerous and 
8 obvious less-burdensome alternatives to the restriction on commercial speech.” City of 
9 Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 417 n.13 (1993). At the same time, the 
10 reasonable fit inquiry does not “require elimination of all less restrictive alternatives.” Fox, 492 
11 U.S. at 478; see also Ward v. Rock Against Racism, 491 U.S. 781, 799 (1989) (holding that a 
12 speech restriction does not fail intermediate scrutiny “simply because a court concludes that the 
13 government’s interest could be adequately served by some less-speech-restrictive alternative”). 
14 Because the government “need[s] leeway,” id. at 481, to exercise its “ample scope of regulatory 
15 authority,” id. at 477, regarding commercial speech, the Supreme Court has held that commercial 
16 speech restrictions that go “only marginally beyond what would adequately have served the 
17 governmental interest,” id. at 479, do not violate the First Amendment. A commercial speech 
18 restriction fails the reasonable fit inquiry only if it “burden[s] substantially more speech than is 
19 necessary to further the government’s legitimate interests.” Id. at 478 (quoting Ward, 491 U.S. at 
20 799). In other words, “Government may not regulate expression in such a manner that a 
21 substantial portion of the burden on speech does not serve to advance its goals.” Ward, 491 U.S. 
22 at 799. The Supreme Court has “been loath to second-guess the Government’s judgment to that 
23 effect.” Fox, 492 U.S. at 478. 
24 With these principles in mind, the Court concludes that the Ordinance is a reasonable 
25 means of achieving the City’s objectives and does not burden substantially more speech than is 
26 necessary to achieve them. The Ordinance burdens a limited amount of speech—inquiries about 
1 prospective occupants’ criminal history—and most, if not all, of the speech that the City has 
2 regulated serves to advance its goals. Plaintiffs argue that the City could have pursued a host of 
3 purportedly less-speech-restrictive measures to achieve its objective in reducing barriers to 
4 housing for people with criminal records, but most of Plaintiffs’ proposals would not achieve the 
5 City’s objectives and none of them show that the City’s choice to enact the Ordinance was an 
6 unreasonable means of pursuing them. 
7 Before turning to Plaintiffs’ proposals, the Court observes that Plaintiffs do not dispute 
8 that the Ordinance is a reasonable means of achieving the City’s interest in combatting landlords’ 
9 use of criminal history as a pretext for racial discrimination. Plaintiffs do not offer any 
10 alternative policies the City could have pursued to achieve this goal, much less numerous 
11 obvious alternatives, and the City’s fair housing testing shows that existing federal, state, and 
12 local laws prohibiting racial discrimination in housing have not been sufficient to solve the 
13 problem. Therefore, the Court concludes that the Ordinance is a reasonable means of achieving 
14 the City’s goal of combatting the use of criminal history as a pretext for racial discrimination. 
15 Although the Court need not “sift[] through all the available or imagined alternative 
16 means of” achieving the City’s objectives, it will discuss several of Plaintiffs’ suggestions to 
17 explain why they do not show that the Ordinance was an unreasonable means of pursuing the 
18 City’s objectives. Ward, 491 U.S. at 797. Plaintiffs first suggest that the City could have 
19 “reform[ed] Washington tort law to better protect landlords from liability for crimes committed 
20 by their tenants.” (Dkt. No. 23 at 18.) But the City does not have the power to change state law, 
21 and this alternative would do nothing to reduce barriers to housing erected by landlords who 
22 discriminate against individuals with criminal histories for reasons other than concerns about 
23 potential tort liability. For instance, many landlords in the Helfgott study reported that they 
24 would be inclined to refuse to rent to individuals with criminal records because “they have bad 
25 values.” Helfgott, 61 Fed. Probation at 20. Reforming Washington tort law would have no 
26 impact on these landlords. Plaintiffs’ suggestion that the City could “indemnify or insure 
1 landlords willing to rent to individuals with a criminal history” suffers from the same defect. (Id. 
2 at 19.) 
3 Plaintiffs also offer several suggestions that would allow landlords to continue to 
4 discriminate against some individuals with criminal histories but not everyone. Specifically, 
5 Plaintiffs suggest that the City could have allowed landlords to continue to ask about all crimes 
6 but not arrests, “serious offenses” but not other crimes, or all crimes committed within two years 
7 of the date of a prospective occupant’s rental application. (Id.) Along similar lines, Plaintiffs 
8 suggest that the City could have exempted more landlords from the Ordinance or could have 
9 required landlords to consider applicants’ criminal history on a case-by-case basis rather than 
10 entirely prohibiting them from considering it. (Id. at 20–21.) The problem with these suggestions 
11 is that they would require the City to substitute Plaintiffs’ objectives for the City’s. 
12 In enacting the Ordinance, the City made a policy decision to prohibit landlords from 
13 considering any crimes, no matter how violent or how recent. Plaintiffs argue that the City 
14 should have pursued different objectives: perhaps allowing landlords to continue to reject any 
15 tenant based on criminal history so long as the landlord makes an individualized assessment of 
16 each tenant’s criminal history or perhaps prohibiting landlords from considering non-violent 
17 crimes or crimes committed several years ago but allowing them to consider recent crimes. 
18 Reasonable people could disagree on the best approach, but the Court’s role is not to resolve 
19 those policy disagreements; it is to determine whether there are numerous obvious and less 
20 burdensome methods of achieving the City’s objectives. 
21 If the Court were to accept Plaintiffs’ logic, it would mean that commercial speech 
22 restrictions would rarely survive constitutional challenge because plaintiffs could always argue 
23 the government should have applied a restriction to fewer people. If, for example, the City had 
24 enacted Plaintiffs’ proposal to prohibit landlords from asking about only crimes that were more 
25 than two years old, another plaintiff could argue that it should have been three years, or three-
26 and-a-half, or four, and so on. The Supreme Court has not analyzed commercial speech 
1 restrictions this way. For instance, in Florida Bar, the Court determined that the Florida Bar’s 
2 regulation prohibiting personal injury lawyers from “sending targeted direct-mail solicitations to 
3 victims and their relatives” within 30 days of “an accident or disaster” was “reasonably well 
4 tailored,” without requiring the bar to explain why it did not adopt a 28 or 29-day ban that would 
5 have burdened less speech. 515 U.S. at 620, 633. At bottom, the reasonable fit test “allow[s] 
6 room for legislative judgments” and the legislature’s judgment here was that prohibiting 
7 landlords from considering all crimes was the best way to achieve the City’s interests. Edge 
8 Broad., 509 U.S. at 434. 
9 A. The Ordinance is Not Substantially Overbroad. 
10 Having concluded that the statute is constitutional in its core applications, Plaintiffs’ 
11 traditional facial challenge fails. See Stevens, 559 U.S. at 472. The Court now must turn to 
12 whether the statute is facially unconstitutional under the less-demanding overbreadth standard. 
13 Plaintiffs argue that even if the statute is constitutional at its core, it is substantially overbroad for 
14 two reasons: First, the Ordinance prohibits landlords from asking individuals and entities other 
15 than prospective occupants and the RHA about prospective occupants’ criminal history, such as 
16 former landlords or the courts. (Dkt. No. 48 at 28.) Second, Plaintiffs argue, the statute is so 
17 broad that it prohibits anyone from investigating the criminal history of any prospective occupant 
18 or tenant. (See id. at 28–29.) Thus, according to Plaintiffs, the Ordinance prohibits journalists 
19 from investigating the criminal history of anyone who happens to be a renter and prohibits 
20 firearm dealers and employers from running background checks on gun purchasers or 
21 prospective employees who are renters. (Id.) Neither argument is persuasive. 
22 Prohibiting the government from enforcing a statute that is constitutional in its core 
23 applications but arguably unconstitutional in others is “strong medicine” that courts use 
24 “sparingly and only as a last resort.” Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973). To 
25 prevail on their overbreadth challenge, Plaintiffs “must demonstrate from the text of [the 
26 Ordinance] and from actual fact that a substantial number of instances exist in which the 
1 [Ordinance] cannot be applied constitutionally.” N.Y. State Club Ass’n, Inc. v. City of N.Y., 487 
2 U.S. 1, 14 (1988). When a statute is overbroad but not substantially overbroad, “whatever 
3 overbreadth may exist should be cured through case-by-case analysis of the fact situations to 
4 which its sanctions, assertedly, may not be applied.” Broadrick, 413 U.S. at 615–16. Thus, “the 
5 mere fact that one can conceive of some impermissible applications of a statute is not sufficient 
6 to render it susceptible to an overbreadth challenge.” Members of City Council of City of L.A. v. 
7 Taxpayers for Vincent, 466 U.S. 789, 800 (1984). 
8 Plaintiffs argue that the statute is substantially overbroad because it prohibits landlords 
9 from asking individuals other than prospective occupants about their criminal history, and these 
10 conversations are not commercial speech because they are not proposals to engage in 
11 commercial transactions. (Dkt. No. 48 at 28.) The City does not dispute that the statute covers 
12 these inquiries, so the Court accepts Plaintiffs’ interpretation. Even so, the Court need not 
13 analyze whether these hypothetical applications of the Ordinance would be constitutional 
14 because even assuming they are not, Plaintiffs have not shown “from actual fact that a substantial 
15 number of [those] instances exist.” N.Y. State Club Ass’n, 487 U.S. at 14; see also Wash. State 
16 Grange, 552 U.S. at 449–50 (“In determining whether a law is facially invalid, [courts] must be 
17 careful not to . . . speculate about ‘hypothetical’ or ‘imaginary’ cases.”). Plaintiffs do not claim 
18 to have ever contacted a former landlord or court for criminal history information, nor do they 
19 provide any evidence that other landlords have. Therefore, Plaintiffs have not shown on this 
20 record that any landlord has done so, much less a substantial number of landlords. See id. 
21 Plaintiffs also argue that the statute extends well beyond the housing context because it 
22 prohibits “any person” from asking about a prospective occupant’s criminal history. Thus, 
23 Plaintiffs argue, the statute prohibits journalists, firearm dealers, and employers from 
24 investigating the criminal history of anyone who happens to be a renter. (Dkt. No. 48 at 29.) The 
25 Court agrees that the inquiry provision, which applies to “any person,” could be interpreted to 
26 cover these inquiries. But, because the Court is construing a City ordinance, it may defer to the 
1 City’s plausible interpretation of the Ordinance, including any limiting construction the City has 
2 adopted. Sorrell v. IMS Health, Inc., 564 U.S. 552, 563 (2011); Vill. of Hoffman Ests. v. Flipside, 
3 Hoffman Ests., Inc., 455 U.S. 489, 494 n.5 (1982) (“In evaluating a facial challenge to a state 
4 law, a federal court must, of course, consider any limiting construction that a state court or 
5 enforcement agency has proffered.”); S.M.C. § 14.09.085 (providing that the City Attorney’s 
6 Office—the City’s counsel in this litigation—shall enforce the Ordinance). The City argues that 
7 the Ordinance applies only in the context of housing transactions because it is entitled the “Fair 
8 Chance Housing Ordinance.” (Dkt. No. 50 at 7.) Although the title of the Ordinance is a thin 
9 reed on which to rest a limiting construction, and the precise boundaries of the Ordinance under 
10 the City’s interpretation are not clear, the City’s interpretation is not implausible. See S.M.C. § 
11 1.04.030 (“the names and headings of titles, chapters, subchapters, parts, . . . and sections of the 
12 Seattle Municipal Code [are] part of the law”). Therefore, the Court accepts the City’s limiting 
13 construction that the statute does not apply to journalists or firearm dealers or employers running 
14 background checks. 
15 Because Plaintiffs have not shown “from the text of [the Ordinance] and from actual fact 
16 that a substantial number of instances exist in which the [Ordinance] cannot be applied 
17 constitutionally,” their overbreadth challenge also fails. N.Y. State Club Ass’n, 487 U.S. at 14. 
18 V. CONCLUSION 
19 For the foregoing reasons, the Court DENIES Plaintiffs’ motion for summary judgment 
20 and GRANTS the City’s motion for summary judgment. 

21 
 DATED this 6th day of July 2021. 
22 
 A 
23 
24 
25 
 John C. Coughenour 
 UNITED STATES DISTRICT JUDGE 
26